**ALAN A., et al., Plaintiffs,**

v.

**Peter VERNIERO, et al., Defendants.**

**Civil Action No. 97–1288 (AJL).**

United States District Court,
D. New Jersey.

June 27, 1997.

Susan Reisner, Michael Buncher, Edward Barocas, Public Defender, Trenton, NJ, for Plaintiffs.

Peter Verniero, Joseph Yannotti, Rhonda S. Berliner–Gold, Attorney General of New Jersey, Trenton, NJ, for Peter Verniero.

Ronald S. Fava, Lisa Squitieri, Passaic County Prosecutor, Paterson, NJ, for Ronald S. Fava.

William H. Schmidt, Judith A. Eisenberg, Bergen County Prosecutor, Hackensack, NJ, for William H. Schmidt.

Faith S. Hochberg, George S. Leone, U.S. Attorney, Camden, NJ, for U.S. as Amicus Curiae.

. Frank W. Hunger, Vincent M. Garvey, Henry A. Azar, Jr., Washington, D.C., for Department of Justice as Amicus Curiae.

## OPINION

LECHNER, District Judge.

This is an action for emergent relief brought by plaintiffs Alan A. ("Alan A."), Barry B. ("Barry B."), Carl C. ("Carl C."), David D. ("David D."), Jeff J. ("Jeff J."), Kenneth K. ("Kenneth K.") (all fictitious names, collectively, the "Plaintiffs").[1] Plain-

---

1. The initial complaint ("Unfiled Complaint") in this action named eleven plaintiffs. The Unfiled Complaint was not filed, but was withdrawn when counsel for the Plaintiffs ("Counsel for Plaintiffs") were advised it would not be placed under seal. Counsel for Plaintiffs were given the opportunity to redraft and resubmit the Unfiled Complaint using fictitious names.

The redacted complaint ("Verified Complaint") was filed naming eight plaintiffs. Three of the Plaintiffs in the Unfiled Complaint, Evan E., Frank F. and Gary G. were not included in the Verified Complaint because their claims were

tiffs are subject to the requirements of Megan's Law, New Jersey's sex offender registration and notification act, N.J.S.A. 2C:7–1 et seq. ("Megan's Law" or the "Act").[2] The

rendered moot. Two of the Plaintiffs, Evan E. and Frank F., were dropped from the suit because, as a result of proceedings instituted pursuant to Megan's Law, their classifications were reduced to Tier I, which requires no community notification. See 10 April 1997 Affidavit of Lisa Squitieri ("10 April Squitieri Aff."), ¶¶ 30–31. The third omitted Plaintiff was classified as a Tier II, however the parties agreed only his family and law enforcement would be notified. Id., ¶ 32.

On 14 May 1997, the Plaintiffs were granted leave to file an amended complaint ("First Amended Complaint"). The First Amended Complaint omitted two additional Plaintiffs, Harry H. and Irving I. Both Harry H. and Irving I. were reduced to Tier I, requiring community notification. See 5 May 1997 Affidavit of Lisa Squitieri ("5 May Squitieri Aff."), ¶¶ 7–8.

As will be discussed, it appears the claims of two additional plaintiffs, Alan A. and Carl C., may also be rendered moot.

**2.** This action was brought to the court as an emergent matter at 3:00 p.m. on 21 March 1997. The filings presented by the Plaintiffs were voluminous—in excess of two reams of paper—and violated Rule 7.2(b) (formally, Rule 27B) of the General Rules Governing the District of New Jersey ("Local Rule 7.2(b)") in that the supporting brief was grossly overlength and printed in small type font. The Plaintiffs were directed to refile their brief in accordance to Local Rule 7.2(b). A conference was scheduled for 8:00 a.m. on 26 March 1997 (the "26 March 1997 Conference").

At the 26 March 1997 Conference, Plaintiffs indicated they would be filing their submissions on 27 March 1997. A briefing schedule was entered.

On 27 March 1997, Plaintiffs submitted: Verified Complaint, with Exhibits A through W attached; Brief and Appendix in Support of Plaintiffs' Motion for Preliminary Injunction ("Moving Brief"), with Exhibits A–1 to A–134 attached; Proposed Forms of Order.

On 11 April 1997, the defendants ("Defendants") submitted: Brief on Behalf of Defendant Peter Verniero, Attorney General of New Jersey, in Opposition to Motion for Preliminary Injunction ("Opposition Brief"); 10 April 1997 Affidavit of Judith Eisenberg ("10 April Eisenberg Aff."); 10 April Squitieri Aff.; 10 April 1997 Affidavit of Jessica Oppenheim ("Oppenheim Aff."). By letter, dated 11 April 1997 from Jane Deaterly Plaisted ("11 April 1997 Letter"), it was advised that "the Essex County Prosecutor's Office, on behalf of all County Prosecutor defendants except Bergen and Passaic Counties, will rely on the [Opposition Brief] submitted by Peter Verniero, Attorney General of the State of New Jersey...." See 11 April 1997 Letter.

An amicus curiae brief was submitted on 11 April 1997 by the United States Attorney's Office ("USA Brief"). The submission included an Appendix with Exhibits 1 through 25 attached ("USA Appendix").

On 15 April 1997, Plaintiffs submitted: Reply Brief on Behalf of Plaintiffs Alan A. et al. In Support of Motion for Preliminary Injunction ("Reply Brief").

On 21 April 1997, Plaintiffs submitted: Reply Brief on Behalf of Plaintiffs, Alan A. et al. to the Brief of the Amicus Curiae, the United States ("Amicus Reply Brief").

A hearing was held on 24 April 1997 ("24 April Hearing") where it was determined this matter would be stayed pending the completion of state court proceedings. See 24 April Hearing Transcript ("24 April Tr."). By letter, dated 24 April 1997, the Defendants were requested to inform the court of any changes in the status of the state court proceedings. In response to this request, the Defendants submitted: 28 April 1997 Affidavit of Lisa Squitieri ("28 April Squitieri Aff."); 28 April 1997 Affidavit of Judith Eisenberg ("28 April Eisenberg Aff."); 5 May 1997 Affidavit of Lisa Squitieri ("5 May April Squitieri Aff."); 7 May 1997 Affidavit of Judith Eisenberg ("7 May Eisenberg Aff."); 12 May 1997 Affidavit of Lisa Squitieri ("12 May Squitieri Aff."); 22 May 1997 Affidavit of Lisa Squitieri ("22 May Squitieri Aff."); 4 June 1997 Affidavit of Judith Eisenberg ("4 June Eisenberg Aff."); 20 June 1997 Affidavit of Lisa Squitieri ("20 June Squitieri Aff."); 20 June 1997 Affidavit of Kathleen Ternovay ("20 June Ternovay Aff.").

On 3 June 1997, the Plaintiffs filed the Certification of Alison Perrone ("Perrone Cert."), with Exhibits 1 through 21 attached. The Exhibits attached to the Perrone Cert. are redacted affidavits submitted by the Office of the Public Defender in the matter of W.P. v. Poritz as well as redacted affidavits which were prepared for filing in the instant matter. See Perrone Cert., ¶ 4. On 10 June 1997, Plaintiffs submitted an additional affidavit from "Affiant # 20." On 24 June 1997, Plaintiffs submitted the Certification of Edward Barocas ("Barocas Cert."), with Exhibits A through D attached.

On 20 June 1997, a hearing was held ("20 June Hearing"). At the 20 June Hearing, the parties were directed to submit a list of cases of which the New Jersey Attorney General appealed a tier determination to the New Jersey Superior Court, Appellate Division ("Appellate Division") or to the New Jersey Supreme Court. The Plaintiffs also submitted: Stenographic Transcript of Plea of David D. ("David D. Plea Tr."); Transcript of State Court Tier Classification Proceedings for David D ("David D. Tier Tr."); Transcript of Conference Call Hearing Before Appellate Division ("David D. Appeal Tr.").

On 23 June 1997, the State transmitted a letter advising the court of a recent Supreme Court decision. This letter contained legal argument

Defendants in this matter are Peter Verniero, Attorney General of New Jersey, William H. Schmidt ("Schmidt"), Bergen County Prosecutor and Ronald S. Fava ("Fava"), Passaic County Prosecutor (at times, collectively referred to as "Prosecutor").[3] Jurisdiction is alleged pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and 42 U.S.C. § 1983. First Amended Complaint, ¶ 2. Declaratory and injunctive relief is requested pursuant to 28 U.S.C. §§ 2201 and 2202. *Id.*, ¶ 3.

On 14 May 1997, Plaintiffs filed the First Amended Complaint. In the First Amended Complaint, Plaintiffs seek: 1) "[i]ssuance of a temporary restraining order/preliminary injunction prohibiting the [D]efendants and anyone acting in concert with them from proceeding with conferences or hearings in [s]tate [c]ourt for the purpose of determining tier classification and manner of community notification in this matter during the pendency of this temporary restraining order/preliminary injunction [ ('Request to Enjoin State Proceedings') ]," 2) "[i]ssuance of an immediate temporary restraining order/preliminary injunction prohibiting the [D]efendants and anyone acting in concert with them from issuing or disseminating in any manner Tier II or Tier III notification regarding members of the Plaintiffs under N.J.S.A. 2C:7–1 *et seq.*, during the pendency of this action or, in the alternative, until fifteen days following the Third Circuits decision in *W.P. v. Verniero et al.*, (Dkt No. 96–5416) [ ('Request to Enjoin Notification') ]", 3) "[e]ntry of a declaratory judgment which defines the rights of the Plaintiffs and all members of the Plaintiffs' proposed class and which invalidates Megan's Law as being unconstitutional [ ('Request for Declaratory Judgment') ]". *See* First Amended Complaint at 17–18. Plaintiffs further request relief from the obligation to post a bond ("Request For Relief from Posting Bond"), an order placing this matter under seal,[4] an order permitting Plaintiffs to proceed *In Forma Pauperis* ("Request to Proceed *In Forma Pauperis*"), and other relief as Plaintiffs may be entitled.[5] *Id.*

Megan's Law is constitutional. The Plaintiffs have demonstrated no possibility of success on the merits of their claims. Accordingly, for the reasons set forth below, the Request to Enjoin State Proceedings, the Request to Enjoin Notification and the Request for a Declaratory Judgment are denied. The Request for Relief from Posting Bond and the Request to Proceed *In Forma Pauperis* were not briefed and are not addressed in this opinion.

*Facts*

*A. Parties*

*1. Plaintiffs* [6]

Plaintiffs contend the Act, specifically the community notification provisions, violates

---

which was not considered for purposes of this opinion.

3. The Verified Complaint named all twenty-one state prosecutors.

4. On 21 March 1997, the parties were informed that the courtroom would not be closed. Transcript of Proceedings, dated 21 March 1997 ("21 March Tr."), 6. The Plaintiffs were given the alternative of redacting their submissions by using code numbers or fictitious names. *Id.* at 9. The Plaintiffs were advised that if a request was made to disclose the identity of the fictitious designations, and if Plaintiffs were not successful in opposing such request, the request would be stayed to permit the Plaintiffs to appeal such decision to the Third Circuit Court of Appeals ("Third Circuit"). Transcript of Proceedings, dated 26 March 1997 ("26 March Tr."), 10.

On 27 March 1997, an order was entered, at the request of the Plaintiffs, denying the request of the Plaintiffs to place the matter under seal.

*See* Order, dated 27 March 1997 ("27 March Order").

On 2 April 1997, the Plaintiffs appealed the 27 March Order to the Third Circuit. Specifically, the Plaintiffs petitioned the Third Circuit to issue a writ of mandamus directing this court to grant injunctive relief and to seal the record. By order, dated 14 April 1997, the petition for writ of mandamus was denied. *See In re Alan A. et al.*, Dkt No. 97–5162, (3d Cir. 14 April 1997).

5. Plaintiffs have submitted no affidavits from which to determine indigence for the purposes of entering an order allowing them to proceed *in forma pauperis*. *See* 28 U.S.C. § 1915(a)(1).

6. The Verified Complaint sought a class certification, defined as follows:

All persons required to register as a sex offender pursuant to N.J.S.A. 2C:7–1 *et seq.* and whose offenses were committed on or after [31 October 1994], the effective date of the New

their constitutional right to procedural due process, privacy, to be free from double jeopardy and to be free from cruel and unusual punishment. Moving Brief at 1.

Each of the remaining Plaintiffs is a resident of the State of New Jersey and was convicted of a sexual offense, as defined in Megan's Law, and has been classified by a county Prosecutor as either a Tier II or Tier III offender. First Amended Complaint, ¶¶ 5–9, 16. Each Plaintiff is subject to the notification and tier classification provision of the Act. The date each Plaintiff's offense was committed was on or after the effective date of the Act. *Id.*

Alan A. is eighteen years old and lives with his father. Alan A. pleaded guilty to Aggravated Sexual Assault for having sex with a twelve year old minor when Alan A. was sixteen years old. *Id.,* ¶ 5. Alan A. was found delinquent as a juvenile and sentenced to two years at a juvenile medium security facility. *Id.* Alan A. was paroled in 1996. *Id.*

Barry B. is twenty-three years old and lives with his mother. *Id.,* ¶ 6. Barry B. pleaded guilty to sexual assault for committing a sexual offense against a minor. Barry B. was sentenced to four years probation. *Id.*

Carl C. is nineteen years old. Carl C. pleaded guilty to aggravated sexual contact. Carl C. was sentenced to three years probation. *Id.,* ¶ 7.

David D. is twenty three years old and lives with his mother and step-father. David D. pleaded guilty to endangering the welfare of a child by having committed a sexual act against a minor. David D. was sentenced to four years confinement and was paroled in 1996. *Id.,* ¶ 8.

Jeff J. is sixty-three years old. Jeff J. pleaded guilty to endangering the welfare of a minor. Jeff J. was sentenced to five years probation and directed to have no contact with the victim. *Id.,* ¶ 9.

Kenneth K. is sixty-three years old. Kenneth K. pleaded guilty to endangering the welfare of a child, a minor household member. Kenneth K. was sentenced to five years probation, no victim contact and counseling. *Id.,* ¶ 10.

### 2. *Defendants*

As stated, the Defendants are Peter Verniero, the Attorney General of the State of New Jersey, who is responsible for implementing and prosecuting Megan's Law on a statewide basis. *Id.,* ¶ 11. The remaining Defendants are Schmidt, the Bergen County Prosecutor and Fava, the Passaic County Prosecutor. *Id.,* ¶¶ 12–13.

### B. *Megan's Law*

Megan's Law was enacted on 31 October 1994.[7] The Act requires certain sex offenders to register with local law enforcement, *see* N.J.S.A. 2C:7–2, and authorizes law enforcement agencies "to release relevant and necessary information regarding sex offenders to the public when the release of the information is necessary for public protection...." *See* N.J.S.A. 2C:7–5. The purpose of the registration and subsequent notification is proffered in the first section of the Act:

a. The danger of recidivism posed by sex offenders and offenders who commit other predatory acts against children, and the dangers posed by persons who prey on others as a result of mental illness, require

Jersey Registration and Community Notification Laws, and who have been or will be classified as a [T]ier II or [T]ier III offender. Verified Complaint, ¶ 6. The First Amended Complaint omitted the request for class certification. *See* First Amended Complaint. This issue concerning a class and class certification is no longer in this case.

**7.** Megan's Law was enacted as a response to the abduction, rape and murder of seven year old Megan Kanka in the summer of 1994. Now convicted of these crimes, Jesse Timmendequas

("Timmendequas"), was previously a twice convicted sex offender who lived across the street from Megan's home with two other convicted sex offenders. Megan, her parents and the community were unaware of Timmendequas' criminal history.

"Within one week following the discovery of Megan's body, both political branches proposed extensive legislative and regulatory packages to address the issue." *See W.P. v. Poritz,* 931 F.Supp. 1199, 1204 (D.N.J.1996). The bills were debated on the floor and passed into law. *Id.*

a system of registration that will permit law enforcement officials to identify and alert the public when necessary for the public safety.

b. A system of registration of sex offenders and offenders who commit other predatory acts against children will provide law enforcement with additional information critical to preventing and promptly resolving incidents involving sexual abuse and missing persons.

*See* N.J.S.A. 2C:7–1.

a. *Registration Requirement*

The Act "requires registration [ (the 'Registration Provision') ] of sex offenders convicted after its effective date and all prior convicted offenders whose conduct was found to be repetitive or compulsive." *Doe v. Poritz*, 142 N.J. 1, 20, 662 A.2d 367 (1995); *see* N.J.S.A. 2C:7–2. The sex offenses that trigger the Registration Provision include the crimes of aggravated sexual assault, sexual assault, aggravated criminal sexual contact and kidnapping pursuant to paragraph (2), subsection c. of N.J.S.A. 2C:13–1 or an attempt to commit any of these crimes. *See* N.J.S.A. 2C:7–2(a). "[F]or those convicted after [the] effective date, added to the foregoing are various laws, concerning endangering the welfare of a child, luring or enticing,

criminal sexual conduct if the victim is a minor, and kidnapping, criminal restraint, or false imprisonment if the victim is a minor and the offender is not the parent," or an attempt to commit any of these offenses.[8] *Doe*, 142 N.J. at 20, 662 A.2d 367.

The Registration Provision requires the offender to provide to the local law enforcement information such as the offender's name, age, race, gender, date of birth, height, weight, hair and eye color, address of legal and temporary residence, date and place of employment, date and place of conviction, adjudication or acquittal by reason of insanity, indictment number, fingerprints, a brief description of the crime or crimes for which registration is required, as well as other information deemed necessary to assess the risk of the future commission of a crime. N.J.S.A. 2C:7–4(b); Complaint, ¶ 15.

An offender may make an application "to terminate the obligation upon proof that [he or she] has not committed an offense within [fifteen] years following conviction or release from a correctional facility for any term of imprisonment imposed ... and is not likely to pose a threat to the safety of others." *See* N.J.S.A. 2C:7–2(f). The failure of an offender to comply with the Registration Provision is a fourth degree crime. N.J.S.A. 2C:7–2(a).

**8.** The relevant section of the Registration Provision states:

> b. For the purposes of this act a sex offense shall include the following:
> (1) Aggravated sexual assault, sexual assault, aggravated criminal sexual contact, kidnapping pursuant to paragraph (2) of subsection c. of [N.J.S.A.] 2C:13–1 or an attempt to commit any of these crimes if the court found that the offender's conduct was characterized by a pattern of repetitive, compulsive behavior, regardless of the date of the commission of the offense or the date of conviction;
> (2) A conviction, adjudication of delinquency, or acquittal by reason of insanity for aggravated sexual assault; sexual assault; aggravated criminal sexual contact; kidnapping pursuant to paragraph (2) of subsection c. of [N.J.S.A.] 2C:13–1; endangering the welfare of a child by engaging in sexual conduct which would impair or debauch the morals of the child pursuant to subsection a. of [N.J.S.A.] 2C:24–4; endangering the welfare of a child pursuant to paragraph (4) of subsection b. of [N.J.S.A.] 2C:24–4; luring or enticing pursuant to section 1 of P.L.1993, c. 291 (C. 2C:13–6); criminal

> sexual contact pursuant to [N.J.S.A.] 2C:14–3b. if the victim is a minor; kidnapping pursuant to [N.J.S.A.] 2C:13–1, criminal restraint pursuant to [N.J.S.A.] 2C:13–2, or false imprisonment pursuant to [N.J.S.A.] 2C:13–3 if the victim is a minor and the offender is not the parent of the victim; or an attempt to commit any of these enumerated offenses if the conviction, adjudication of delinquency or acquittal by reason of insanity is entered on or after the effective date of this act or the offender is serving a sentence of incarceration, probation, parole or other form of community supervision as a result of the offense or is confined following acquittal by reason of insanity or as a result of civil commitment on the effective date of this act;
> (3) A conviction, adjudication of delinquency or acquittal by reason of insanity for an offense similar to any offense enumerated in paragraph (2) or a sentence on the basis of criteria similar to the criteria set forth in paragraph (1) of this subsection entered or imposed under the laws of the United States, this State or another state.
> N.J.S.A. 2C:7–2(b).

The Plaintiffs have registered with local law enforcement and provided the information required pursuant to the Registration Provision. First Amended Complaint, ¶ 15.

### b. Notification Provision

Pursuant to the notification provision in the Act ("Notification Provision"), local law enforcement agencies are required to give appropriate notification of the offender's presence in the community. *Doe*, 142 N.J. at 22, 662 A.2d 367. Megan's Law provides for three levels of notification based upon the risk of re-offense of the offender (the "Tier Classification").

The Act directed the New Jersey Attorney General to promulgate guidelines and procedures for notification. N.J.S.A. 2C:7–8. The New Jersey Attorney General implemented the Registrant Risk Assessment Scale Manual ("Risk Assessment Manual") and the Registrant Risk Assessment Scale ("RRAS"). The Risk Assessment Manual was created "to assist in the implementation of the [RRAS]." *See* Risk Assessment Manual, attached to First Amended Complaint as Exhibit G. The Risk Assessment Manual and the RRAS were designed to provide "an objective standard on which to base the community notification decision mandated by statute and to insure that the notification law is applied in a uniform manner throughout the State." *Id.*

The Prosecutor of the county where the offender has chosen to reside initiates the Tier Classification process by applying the Risk Assessment Manual and the thirteen factors provided in the RRAS. *Id.*, ¶ 16.

The factors are recognized by experts in the field of risk assessment as reliable predictors of recidivism. *Matter of C.A.*, 146 N.J. 71, 105, 679 A.2d 1153 (1996). The offender is given a score with respect to each factor: low risk (0), moderate risk (1), or high risk (3). *See* RRAS, attached to First Amended Complaint as Exhibits A through F.

The thirteen factors that comprise the RRAS are organized into four categories: 1) seriousness of the offense, 2) offense history, 3) characteristics of the offender, and 4) community support. First Amended Complaint, ¶ 17. The initial score for each of the thirteen factors is increased by multipliers, which differ by heading; the data are added together for a final risk assessment score ("RRAS Score"). First Amended Complaint, ¶ 18. Only one RRAS exists for all sex offenders registered under the Act. *Id.*, ¶ 19.

The Prosecutor of the appropriate county determines the scope of notification by employing the guidelines promulgated by the New Jersey Attorney General. *See* Guidelines for Law Enforcement for Notification to Local Officials and/or the Community of the Entry of a Sex Offender into the Community ("Notification Guidelines"), attached to First Amended Complaint as Exhibit H.[9]

If the risk of re-offense is minimal (an RRAS Score of 0 to 36), notification is limited to the law enforcement agencies likely to encounter the offender ("Tier I"). If risk of re-offense is moderate (an RRAS Score of 37 to 73) community organizations such as schools, religious and youth groups are notified ("Tier II"). If there is a high risk of re-

---

**9.** In Bergen County, an agent in the office prepares a discovery file from the Prosecutor's Office Docket file. 10 April Eisenberg Aff., ¶ 4. The file includes such items as the judgment of conviction, presentence investigation report, pre-incarceration Avenel or other psychological evaluations, indictment, investigative reports, and sworn statements of the offender and the victim taken during the investigation. *Id.* All of this material is available to the offender as discovery during the prosecution of the underlying offense. *Id.* In addition, any reports from probation or from a current therapist are also included. When the file is complete, the material is reviewed and an initial tier is assigned using the RRAS and the Risk Assessment Manual. *Id.*, ¶ 5.

In Passaic County, a Registration Intake Agent obtains all relevant records from the Department of Corrections, county Prosecutors' files, Probation Department files, Parole Agency files and Police records. An Evaluating Agent reviews all the documents received and completes the RRAS. 10 April Squitieri Aff., ¶¶ 8–10. The Evaluating Agent then submits the file to the Unit Investigator who contacts the offender's school, therapist, employer, probation or parole officer and memorializes the information. The Unit Investigator then completes an independent RRAS. *Id.*, ¶¶ 10–11. The file and the two RRAS are reviewed by the Unit Attorney, who will make appropriate changes, may direct the Unit Investigator to investigate further, and ultimately approves the file for service. *Id.*, ¶¶ 12–13.

offense (an RRAS Score of 74 to 111) those members of the public "likely to encounter" the offender will be notified ("Tier III"). There is no classification for individuals who pose no risk of re-offense. N.J.S.A. 2C:7-8(c); Notification Guidelines at 7. The New Jersey Supreme Court clarified that notification under Tier II and Tier III should be only to organizations and individuals " 'likely to encounter' the offender." *Doe,* 142 N.J. at 29, 662 A.2d 367.

Offenders do not participate in the Tier Classification and scope of notification determinations made by the Prosecutor. First Amended Complaint, ¶ 23. An offender is provided written notice of the Tier Classification and is given the opportunity to object and request a hearing (the "Tier Determination Hearing"). *Id.,* ¶ 24. "[I]f such application is made, there will be no notification until and unless affirmed by the court or, if reversed, until and unless the prosecutor provides notification in accord with the reasons for reversal." *Doe,* 142 N.J. at 31, 662 A.2d 367. All of the Plaintiffs in this action have filed requests for judicial review of the Prosecutor's proposed Tier Classification and community notification decision. First Amended Complaint, ¶ 27.

### c. *Tier Determination Hearing*

Upon receipt of an objection to the Tier Classification by the offender, a court immediately sets down a date for a hearing and decision on the issue. *Doe,* 142 N.J. at 31, 662 A.2d 367. The offender, or his or her attorney, is provided full discovery, as is the reviewing judge. 10 April Squitieri Aff., ¶ 17. Full discovery includes everything that was relied upon by the Prosecutor in determining the Tier Classification for the offender. *Id.; Doe,* 142 N.J. at 31, 662 A.2d 367 ("The prosecutor shall forthwith turn over all papers, documents, and other material, including the prosecutor's findings and statement of reasons for the level and manner of proposed notification to the court and to the offender and counsel.").

Pre–Tier Determination Hearing conferences are conducted by the trial court ("First Status Conference"). 10 April Squitieri Aff., ¶ 16. In both Bergen County and Passaic County, the First Status Conference takes place in the judge's chambers. 10 April Eisenberg Aff., ¶ 11; 10 April Squitieri Aff., ¶ 18.

At the First Status Conference, the parties attempt to assess whether, with additional information, they will be able to reach an agreement as to the Tier Classification or whether a full Tier Determination Hearing is required. 10 April Eisenberg Aff., ¶ 11; *cf.* 10 April Squitieri Aff., ¶ 18. A final tier status may result from the First Status Conference where the parties are in agreement as to the Tier Classification status. 10 April Eisenberg Aff., ¶ 12. "Generally, [however], the [F]irst [S]tatus [C]onference results in further investigation. . . ." 10 April Squitieri Aff., ¶ 18.

At the time of the filing of this opinion, the status of the conferences and hearings for each of the Plaintiffs were as follows:

Alan A. scored a 54 making [him] a [Tier II] on the RRAS. [He] was personally served on [27 January 1997] for a· [10 February 1997] [F]irst [S]tatus [C]onference. At the [F]irst [S]tatus [C]onference [Alan A,] set forth [his] contentions, however, since the [T]ier designation would not change, even if the issues of contention were resolved in [his] favor, a request for an expert was made. The Passaic County Prosecutor's Office did not object and the court granted the request. It was agreed by all parties that a second status conference would not be necessary. The hearing date was set for [1 April 1997]. Due to inclement weather, [Alan A.'s] expert could not appear, so the matter was adjourned to [29 April 1997]. On [29 April 1997], a hearing was held. After a full day of testimony and oral arguments, the matter was adjourned to [2 May 1997] to conclude oral arguments. On [2 May 1997], the Court heard the remainder of oral arguments and permitted [Alan A.] to reopen [his] case to have a witness testify. The Court reserved and scheduled her decision to be rendered on [9 May 1997]. On [9 May 1997], the judge adjourned the hearing to [5 September 1997] on the condition that [Alan A.] enter therapy. On [5 September 1997], the therapist will be re-

quired to render a further opinion as to the risk of reoffense.[10]

Barry B. scored an 83 initially, making [him] a [Tier III] on the RRAS. [He] was personally served on [20 February 1997] for a [10 March 1997] [F]irst [S]tatus [C]onference. As a result of the [F]irst [S]tatus [C]onference, [his] score was amended to a 77, thus [Barry B.] is still a [Tier III]. Several other issues were raised, and the matter was adjourned to [4 April 1997] for a second status conference. The second status conference was further adjourned by the court due to a scheduling problem to [17 April 1997]. On [17 April 1997], a second status conference was held and continued to [18 April 1997]. The matter could not be resolved and a request for an expert was made by [Barry B.] which was not objected to and granted by the court. The matter [was] scheduled for [30 May 1997] for a third status conference to review the expert's findings.

David D scored a 63 making [him] a [Tier II] on the RRAS. [He] was personally served on 11 February 1997 for a 3 March 1997[F]irst [S]tatus [C]onference. At the [F]irst [S]tatus [C]onference [David D.] set forth [his] contentions, however, since the [T]ier would not change even if the issues of contention were resolved in [his] favor, a request for an expert was made. [The Passaic County Prosecutor's Office] objected to the request and on 10 March 1997 oral argument was conducted and the judge denied the request finding that [David D.] failed to meet the minimum requirement to get an expert. On [27 March 1997] a judicial review hearing was conducted and continued to [1 April 1997]. The court ruled that [David D.] was a moderate risk for re-offense and affirmed the [T]ier designation. The matter was adjourned to [4 April 1997] on the issue of notification. On [4 April 1997] a list of [fourteen] schools/community organizations were submitted to the court and [David D.'s] attorney, along with a map reflecting the zones. The court held that [six] of the

[fourteen] schools could be informed. The Order was signed on [7 April 1997]. The Court granted a [two] day stay, the Appellate Division granted a stay pending appeal on [8 April 1997]. Oral argument, via telephone were (sic) held on [14 April 1997]. The Appellate [Division] affirmed the trial court's findings however their decision [was filed on 29 April 1992]. Based on the agreement made in court on [24 April 1997], no notification [was to] occur until the agreed upon time has elapsed. On [30 April 1997], stay pending certification was consented to.[11]

22 May Squitieri Aff., ¶¶ 1–3.

Evan E. scored a 44, making [him] a [Tier II] on the RRAS. [He] was personally served on [4 February 1997] for a [24 February 1997] [F]irst [S]tatus [C]onference. [Evan E.] failed to appear and a default judgment was requested but it was denied. The court mailed [Evan E.] a letter giving [him] a new date on [24 March 1997]. On [24 March 1997], [Evan E.] appeared with [his] attorney. The matter was conferenced. As a result of the status conference, the score was changed to a 36, a [Tier I], thus the matter was concluded.

Frank F. scored a 51, making [him] a [Tier II] on the RRAS. [He] was personally served on [29 January 1997] for a [10 February 1997] [F]irst [S]tatus [C]onference. At the [F]irst [S]tatus [C]onference several issues were discussed and further investigation became necessary. The matter was set down for a second status conference for [24 February 1997]. At the second status conference the Passaic County Prosecutor's Office changed [Frank F.'s] score from a 51 to a 41, but [he] was still a [Tier II]. A request for an expert was made which was not objected to by the Passaic County Prosecutor's Office and was granted by the judge. The final hearing was set for [21 March 1997]. At the final hearing, the court concluded

---

**10.** This review period suggests Alan A. may be reduced to Tier I. *See* Transcript of Proceedings, dated 20 June 1997 ("20 June Tr."), at 22.

**11.** Pursuant to a phone call from Michael Buncher on 18 June 1997, chambers were advised the New Jersey Supreme Court denied the petition for certification filed on behalf of David D.

that despite the [Frank F.'s] score, [he] was a low risk for re-offense. Thus the judge made [him] a [Tier I], and the matter was concluded.

Gary G. scored a 45, making [him] a [Tier II] on the RRAS. [He] was personally served on [16 January 1997] for a [3 February 1997] [F]irst [S]tatus [C]onference. [Gary G.] failed to appear for the [F]irst [S]tatus [C]onference. The judge requested that [the Prosecutor's Office] reach out to [Gary G.] to inform [him] of the new date. That request was carried out. On [18 February 1997, Gary G.] appeared without an attorney. [He] was directed to go to the public defender's office to apply for an attorney and the [F]irst [S]tatus [C]onference was adjourned to [24 March 1997]. At the [F]irst [S]tatus [C]onference, the case settled and although [he] is classified as a [Tier II], only [his] family and law enforcement were . . . to be told. The settlement was placed on the record and approved by the court. Thus, the matter was concluded.

Harry H. scored a 45, making [him] a [Tier II] on the RRAS. [Harry H.] was personally served on [26 February 1997] for a [21 March 1997] [F]irst [S]tatus [C]onference. At the [F]irst [S]tatus [C]onference several issues were brought to the attention of the Unit Attorney and the judge. The matter was adjourned to [11 April 1997] for a second status conference for further investigation. A conference was held on [11 April 1997] prior to the hearing and [Harry H's] score was lowered to a 41. At the hearing the judge held that the Prosecutor's Office did not meet its prima facie burden as to criteria number one, degree of force, therefore the score was changed to a 36, a tier [I]. Thus, the matter was concluded.

Irving I. scored a 43, making [him] a [Tier II] on the RRAS. [He] was personally served on [13 March 1997] for [a 4 April 1997] [F]irst [S]tatus [C]onference. The [F]irst [S]tatus [C]onference was adjourned by the Court due to scheduling problems. It was adjourned to [17 April 1997]. As a result of the [F]irst [S]tatus [C]onference on [17 April 1997], the Prosecutor's Office amended the score from 43 to 39. An expert was requested by [Irving I.] which was not objected to by the Prosecutor's Office and the request was granted by the Court. On [2 May 1997], a hearing was conducted and the Court held that [Irving I.] was a 39, however, based upon the expert report, [he] was held to be a Tier [I] low risk. Thus, the matter was concluded.

5 May Squitieri Aff., ¶¶ 4–8.

Jeff J. scored a 50, making [him] a [Tier II] on the RRAS. [Jeff J.] was personally served on [13 March 1997] for [a 4 April 1997] [F]irst [S]tatus [C]onference. The [F]irst [S]tatus [C]onference was adjourned by the Court due to scheduling problems. It was adjourned to [17 April 1997]. On [17 April 1997], a request for an expert was made by [Jeff J.] which was not objected to by the Prosecutor's Office and the request was granted. The matter was initially adjourned to [8 May 1997], however a further adjournment was granted at [Jeff J.'s] request since the expert's report was not ready. The matter was initially adjourned to [22 May 1997] however pursuant to the Court's request, it was adjourned to [13 June 1997].

Kenneth K. scored a 52, making [him] a [Tier II] on the RRAS. [Kenneth K.] was personally served on [13 March 1997] for [a 4 April 1997] [F]irst [S]tatus [C]onference. The [F]irst [S]tatus [C]onference was adjourned by the Court due to scheduling problems. The matter was adjourned to [17 April 1997]. On [17 April 1997] the [F]irst [S]tatus [C]onference was held and a request for an expert was made by [Kenneth K.] which was not objected to by the Prosecutor's Office and the request was granted by the Court. The second status conference was scheduled for [23 May 1997], however, pursuant to the Court's request, the matter was adjourned to [13 June 1997].

22 May Squitieri Aff., ¶¶ 27–36.

Carl C. . . . was assessed as a Tier II with [forty-five] points. [Carl C.] was personally served with the notice of [his][T]ier [C]lassification on [4 February 1997]. At that time, he was notified that the deadline

for requesting a hearing was [18 February 1997] and the preliminary conference was scheduled before Judge Ciolino on [4 March 1997].

At the preliminary conference, it was agreed that in order to properly assess [Carl C.'s] [T]ier a current therapist's report, verification of employment and residence were required. Accordingly, Judge Ciolino carried the matter until [8 April 1996]. Subsequently, due to Judge Ciolino's retirement and re-assignment of Megan's Law responsibilities to Judge William Meehan, P.J.S.C., the matter was adjourned to [2 May 1997].

10 April Eisenberg Aff., ¶ 18.

. A conference was held on [6 May 1997], before the Honorable William C. Meehan, P.J.S.C. As a condition of probation, [Carl C.] was ordered to attend sex offender therapy. A report from his therapist noted he has recently been discharged from group therapy for the second time due to [his] lack of cooperation. As a result, Probation has indicated its intention to charge [Carl C.] with a violation of probation and to require [him] to attend individual therapy with a new therapist. It was agreed that [Carl C.'s] counsel will request that the new therapist provide the court with an evaluation. It was agreed the matter would be adjourned until [3 June 1997] at which time a hearing [would] be conducted.

7 May Eisenberg Aff., ¶ 3.

A hearing was held before the Honorable William C. Meehan, P.S.J.C. on [3 June 1997]. At that time, the court ordered that [Carl C.] be classified as a Tier I with a review in six months to determine [Carl C.'s] participation and progress in counselling (sic). Because [Carl C.] recently moved to Passaic County, the matter was transferred to Passaic County to determine the scope of notification.

4 June Eisenberg Aff., ¶ 3. It appears because Carl C. has moved to Passaic County, "the whole process begins anew" and a Tier Classification must be given from Passaic County. *See* 20 June Tr. at 6.

At the Tier Determination Hearing, the offender has the right to be represented by counsel, or if he or she cannot afford it, to have counsel assigned by the court. 10 April Squitieri Aff., ¶ 15. At the Tier Determination Hearing, conducted *in camera*, the Prosecutor must demonstrate that the evidence "justifies the proposed Tier Classification and manner of notification." *Doe*, 142 N.J. at 31–32, 662 A.2d 367. The burden of persuasion then shifts to the offender to demonstrate by a preponderance that the evidence does not conform to the laws and guidelines. *Id.*, at 32, 662 A.2d 367. "The court's determination is independent and based on its own review of the case on the merits." *C.A.*, 146 N.J. at 84, 679 A.2d 1153.

At the Tier Determination Hearing, the rules of evidence do not apply.[12] First Amended Complaint, ¶ 30. The offender is permitted to call his or her own witnesses and cross examine the Prosecutor's witnesses.[13] The offender may subpoena the victim if "absolutely necessary." *Id.*, ¶ 31 (citing *C.A.*, 146 N.J. at 98, 679 A.2d 1153). An offender is allowed to call an expert witness if his or her case is unusual and "falls

---

**12.** This is not unusual. The New Jersey Rules of Evidence "may be relaxed in [certain] instances to admit relevant and trustworthy evidence in the interest of justice." *See* Rule 101 of the New Jersey Rules of Evidence. Similarly, the Federal Rules of Evidence do not apply in many different contexts: preliminary questions of fact, proceedings before grand juries, proceedings for extradition or rendition, preliminary examinations in criminal cases, sentencing, or granting or revoking probation, issuance of warrants for arrest, criminal summonses, and search warrants, and proceedings with respect to release on bail or otherwise. *See* Rule 1101 of the Federal Rules of Evidence.

**13.** In Bergen County, the judge "has permitted [offenders] wide latitude in the conduct of the formal hearing. [Offenders] have called a variety of witnesses on their behalf, including Avenel psychiatrists, parole officers, therapists, their wives and mothers as well as testifying themselves." 10 April Eisenberg Aff., ¶ 13.

In Passaic County, the Unit Attorney presents the case in chief to the court, and the offender's attorney has the right to cross examine witnesses and be heard before the court. 10 April Squitieri Aff., ¶ 23. "If the court makes a finding that the burden has been satisfied, the [offender] puts on [his or her] case. The Unit Attorney also has the same right to cross examine and be heard." 10 April Squitieri Aff., ¶ 23.

outside the heartland of cases." *Id.*, ¶ 32 (citing *In the Matter of Registrant G.B.*, 147 N.J. 62, 82, 685 A.2d 1252 (1996)). The court is granted the authority "to determine (1) the extent of witness production; (2) the extent of cross examination; and (3) the use of expert testimony." *C.A.*, 146 N.J. at 83, 679 A.2d 1153 (citation omitted).

Orders from the trial court which allow for notification contain a provision stating such orders shall not become effective until the expiration of two business days after the date of the execution of the order. *See* Outline of Procedure for Hearings on Objections to Megan's Law Tier 2 and Tier 3 Classification and Manner of Notification Determinations ("Outline of Procedures"), attached to First Amended Complaint as Exhibit P, at 4. The offender may appeal the decision rendered at the Tier Determination Hearing. *Doe*, 142 N.J. at 32, 662 A.2d 367.

*Discussion*

### A. *Abstention Under Younger Doctrine or Rooker–Feldman Doctrine*

As a threshold matter, it must be determined whether the *Younger* abstention doctrine or the *Rooker–Feldman* doctrine precludes the exercise of subject matter-jurisdiction in this matter. *See Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923); *District of Columbia Ct. of App. v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983). The courts which have addressed these issues have held the two doctrines do not preclude consideration of the constitutional claims brought against Megan's Law in Federal court. *See W.P. v. Poritz*, 931 F.Supp. 1187, 1189 (D.N.J.1996); *E.B. v. Poritz*, 914 F.Supp. 85 (D.N.J.1996); *Michael M. et al. v. Verniero et al.*, Civ. No. 97–2435, slip op. at 25–26 (D.N.J. 29 May 1997).

### 1. *Younger Doctrine*

■ The Supreme Court has "emphatically reaffirmed 'the fundamental policy against [F]ederal interference with state criminal prosecutions,'"[14] *see Mitchum v. Foster*, 407 U.S. 225, 230, 92 S.Ct. 2151, 2156, 32 L.Ed.2d 705 (1972) (citing *Younger v. Harris*, 401 U.S. at 46, 91 S.Ct. at 751); *NYLife Distributors, Inc. v. Adherence Group, Inc.*, 72 F.3d 371, 376 & n. 8 (3d Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1826, 134 L.Ed.2d 931 (1996); *see Quackenbush v. Allstate Ins. Co.*, —— U.S. ——, ——, 116 S.Ct. 1712, 1721, 135 L.Ed.2d 1 (1996); *Marks v. Stinson*, 19 F.3d 873, 882 (3d Cir.1994). Pursuant to the principles of equity and comity in the Federal system, the Court has held that, "apart from 'extraordinary circumstance,' a [F]ederal court may not enjoin a pending state prosecution or declare invalid the statute under which the prosecution was brought." *Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498, 509, 92 S.Ct. 1749, 1757, 32 L.Ed.2d 257 (1972) (citing *Younger*, 401 U.S. 37, 91 S.Ct. 746; *Samuels v. Mackell*, 401 U.S. 66, 73, 91 S.Ct. 764, 768, 27 L.Ed.2d 688 (1971)).

■ Extraordinary circumstances exist where irreparable injury is "both great and immediate," *Younger*, 401 U.S. at 46, 91 S.Ct. at 751, for example where the state law is "flagrantly and patently violative of express constitutional prohibitions," *id.* at 53, 91 S.Ct. at 755 (citation omitted), or where there is a showing of "bad faith, harassment, or ... other unusual circumstances that would call for equitable relief." *Id.* at 54, 91 S.Ct. at 755.

■ "The principle underlying *Younger* and *Samuels* is that state courts are fully competent to adjudicate constitutional claims, and therefore a [F]ederal court should, in all but the most exceptional circumstances, refuse to interfere with an ongoing state criminal proceeding." *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 930, 95 S.Ct. 2561, 2567, 45 L.Ed.2d 648 (1975). This rule has been held to apply equally to requests for post-trial intervention by the Federal courts, before the petitioner has exhausted appellate remedies. *See Huffman v. Pursue Ltd.*, 420 U.S. 592, 608, 95 S.Ct. 1200, 1210, 43 L.Ed.2d 482, *reh'g denied*, 421 U.S. 971, 95 S.Ct. 1969, 44

---

**14.** *Younger* has been extended to incorporate civil proceedings as well. *See, infra,* at 1170.

L.Ed.2d 463 (1975).[15] *See also New Orleans Public Service, Inc.*, 491 U.S. at 369, 109 S.Ct. at 2518–19.

The Supreme Court expanded the *Younger* doctrine to incorporate state civil proceedings which implicate important state interests. *See, e.g., Quackenbush,* —— U.S. at ——, 116 S.Ct. at 1721 (1996) (citing *Huffman,* 420 U.S. at 592, 95 S.Ct. at 1202; *Juidice v. Vail,* 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977)); *Middlesex County Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. 423, 432, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1982); *FOCUS v. Allegheny County Court of Common Pleas,* 75 F.3d 834, 843 (3d Cir.1996). Abstention by a Federal court is proper where three elements are present: "(1) the ongoing state proceedings are 'judicial' in nature; (2) the proceedings implicate important state interests; and (3) the proceedings-afford an adequate opportunity to raise the [F]ederal claims." *Olde Discount Corp. v. Tupman,* 1 F.3d 202, 211 (3d Cir.1993), *cert. denied,* 510 U.S. 1065, 114 S.Ct. 741, 126 L.Ed.2d 704 (1994) (citing *Middlesex County Ethics Comm.,* 457 U.S. at 432, 102 S.Ct. at 2521).

The Defendants argue the relief Plaintiffs seek would obstruct either the state court proceedings or the enforcement of the state court decision which is " 'an integral part of the state's judicial process for *Younger* purposes.' " Opposition Brief at 6 (quoting *Marks,* 19 F.3d at 883; *Pennzoil Co. v. Texaco, Inc.,* 481 U.S. 1, 13–14, 107 S.Ct. 1519, 1527, 95 L.Ed.2d 1 (1987)). Defendants further argue the Plaintiffs are free to raise their constitutional challenges at the scheduled hearings and to seek review of any adverse decision before the Appellate Division and New Jersey Supreme Court. *Id.*

One of the prerequisites to application of the *Younger* doctrine requires that there be "an adequate opportunity for redress of [a plaintiff's] constitutional claims" in a state court proceeding. *W.P.,* 931 F.Supp. at 1195 (quoting *Bongiorno v. Lalomia,* 851 F.Supp. 606, 613 (D.N.J.), *aff'd,* 39 F.3d 1168 (3d Cir.1994)). In *Doe,* the New Jersey Supreme Court addressed the same constitutional issues raised in the instant matter. *See Doe,* 142 N.J. at 26–28, 662 A.2d 367 (recognizing that "decision will affect all sex offenders covered by the laws" because plaintiff's claims were the same as any offender could assert). Subsequent state courts have declined to address an offender's constitutional arguments in light of the *Doe* decision. *See In the Matter of G.B.,* 286 N.J.Super. 396, 402, 669 A.2d 303 (App.Div.) ("We need not address registrant's constitutional arguments. The Supreme Court in *Doe* rejected these arguments. The Court held that [Megan's Law] was constitutional, subject to judicial review before notification."), *aff'd,* 147 N.J. 62, 685 A.2d 1252 (1996); *State in Interest of B.G.,* 289 N.J.Super. 361, 373–74, 674 A.2d 178 (App.Div.) (with regard to constitutional issues raised by offender, court noted: "[The] Supreme Court in [*Doe* ] has decided these issues and we cannot further consider the issues at this time."), *certif. denied,* 145 N.J. 374, 678 A.2d 714 (1996).

The Tier Determination Hearings established in Doe were meant to be "summary proceeding[s], limited in nature and scope, ... designed solely to provide review of Tier [C]lassification and [the] extent of notification." *E.B.,* 914 F.Supp. at 90. The judicial review afforded at the Tier Determination Hearing does not appear to be an adequate

---

**15.** The Court stated that, by requiring exhaustion of state appellate remedies for the purposes of applying *Younger,* it did not intend to undermine the principle that one seeking redress for a violation of Federal rights pursuant to 42 U.S.C. § 1983 need not first initiate proceedings in state court. Where, however, state proceedings are initiated and "afford a competent tribunal for resolution of [F]ederal issues," deference to those proceedings must be given. *Huffman,* 420 U.S. at 609 & n. 21, 95 S.Ct. at 1211 & n. 21. *See also New Orleans Pub. Serv., Inc. v. Council of City of New Orleans,* 491 U.S. 350, 369, 109 S.Ct. 2506, 2518–19, 105 L.Ed.2d 298 (1989) ("For *Younger* purposes, the State's trial-and-appeals process is treated as a unitary system, and for a [F]ederal court to disrupt its integrity by intervening in midprocess would demonstrate a lack of respect for the State as sovereign."). In the instant matter, all Plaintiffs have challenged their Tier Classification via the Tier Determination Hearings. *See* First Amended Complaint, ¶ 27. Presently, only David D. has exhausted the state court proceedings and thereafter continues to present an issue. ,

forum to raise constitutional challenges. The nature of the proceeding and the binding affect on the lower courts of the New Jersey Supreme Court's decision regarding the constitutional issues preclude the Plaintiffs from adequately being heard on their constitutional claims. Accordingly, *Younger* abstention is not appropriate in this matter.

### 2. *Rooker–Feldman Doctrine*

The *Rooker–Feldman* doctrine is also inapplicable. Pursuant to the *Rooker–Feldman* doctrine, "[F]ederal district courts lack subject matter jurisdiction to review final adjudications of a state's highest court or to evaluate constitutional claims that are inextricably intertwined with the state court's [decision] in a judicial proceeding." *FOCUS*, 75 F.3d at 840 (quoting *Blake v. Papadakos*, 953 F.2d 68, 71 (3d Cir.1992) (quoting *Feldman*, 460 U.S. at 483 n. 16, 103 S.Ct. at 1316 n. 16) (internal quotation marks omitted)). *See also Ernst v. Child and Youth Serv. Of Chester County et al.*, 108 F.3d 486, 491 (3d Cir.1997). "[T]he existence of a state court judgment ... bars the [F]ederal proceeding under *Rooker–Feldman* only when entertaining the [F]ederal court claim would be the equivalent of an appellate review of that order." *Id.; Ernst*, 108 F.3d at 491 ("[I]t is improper for [F]ederal district courts to exercise jurisdiction over a case that is the functional equivalent of an appeal from a state court judgment.").

The Plaintiffs in the instant matter do not seek review of the result of a Tier Determination Hearing, but rather allege those proceedings are unconstitutional. The Plaintiffs were not parties in *Doe*, the State court decision which held Megan's Law to be constitutional. Accordingly, the issues in the instant matter are not "inextricably intertwined" with the merits of a decision in the state courts.

In addition, the *E.B.* court found the *Rooker–Feldman* doctrine to be inapplicable because the plaintiff did not have a " 'realistic opportunity to fully and fairly litigate' his or her [F]ederal constitutional claim in state court." 914 F.Supp. at 89 (quoting *Centifanti v. Nix*, 865 F.2d 1422, 1433 (3d Cir.1989)). As discussed, it is not clear Plaintiffs will

have the opportunity to present their constitutional claims in the state courts in light of the *Doe* decision. It does not appear David D. raised his constitutional claims in the state court proceedings. Accordingly, the *Rooker–Feldman* doctrine will not preclude consideration of the Plaintiffs' constitutional claims in this matter.

### B. *Temporary Restraining Order/Preliminary Injunction*

"[T]he grant of injunctive relief is an extraordinary remedy ... which should be granted only in limited circumstances." *Frank's GMC Truck Center, Inc. v. General Motors Corp.*, 847 F.2d 100, 102 (3d Cir.1988) (citing *United States v. City of Philadelphia*, 644 F.2d 187, 191 n. 1 (3d Cir.1980)). Four factors are considered in determining whether to issue a preliminary injunction: "(1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will-result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest." *American Civil Liberties Union of New Jersey v. Black Horse Pike Regional Bd. of Educ.*, 84 F.3d 1471, 1477 n. 2 (3d Cir.1996) (citing *Gerardi v. Pelullo*, 16 F.3d 1363, 1373 (3d Cir.1994)); *New Jersey Hosp. Ass'n v. Waldman*, 73 F.3d 509, 512 (3d Cir.1995); *Clean Ocean Action v. York*, 57 F.3d 328, 331 (3d Cir. 1995); *American Tel. and Tel. Co. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir.1994), *cert. denied*, 514 U.S. 1103, 115 S.Ct. 1838, 131 L.Ed.2d 757 (1995); *Duraco Products, Inc. v. Joy Plastic Enterprises, Ltd.*, 40 F.3d 1431, 1438 (3d Cir.1994).

All four factors must be present prior to granting preliminary injunctive relief. *American Tel. And Tel. Co.*, 42 F.3d at 1427; *Duraco Prod.*, 40 F.3d at 1438; *E.B.*, 914 F.Supp. at 90. The decision to grant or deny a request for a preliminary injunction is within the discretion of the trial court. *New Jersey Hosp. Ass'n*, 73 F.3d at 512; *United States v. Price*, 688 F.2d 204, 210 (3d Cir. 1982). Because Plaintiffs fail to demonstrate

a reasonable probability of success on the merits, the Request to Enjoin the State Proceedings, the Request to Enjoin Notification and the Request for a Declaratory Judgment, as applied to David D., are denied.

### 1. *Reasonable Probability of Success on the Merits*

Plaintiffs argue they have a reasonable probability of eventual success on the merits in this litigation on all four constitutional claims raised: 1) procedural due process, 2) double jeopardy, 3) cruel and unusual punishment and 4) privacy. Moving Brief at 4. In support of this contention, Plaintiffs cite the injunction imposed by the Third Circuit pending its decision in *W.P. et al. v. Verniero et al.*, No. 96–5116. Plaintiffs argue the reasonable probability of success is "particularly clear" because *W.P.* involves two of the same claims raised here: due process and double jeopardy. *Id.*

This argument is not persuasive. *W.P.* involves claims and parties distinct from the instant matter. The Plaintiffs in this matter are not members of the members of the class certified in *W.P.* because the offenses committed by Plaintiffs were committed after the passage of Megan's Law. The class certified in *W.P.* committed offenses prior to the enactment of Megan's Law. Moreover, there is no indication what the basis is for the continued stay imposed by the Circuit. Accordingly, extension of the injunction imposed in favor of the *W.P.* class by the Third Circuit bears no relevance here.

### a. *Fourteenth Amendment Claims*

Plaintiffs first argue Megan's Law violates due process. In *Doe*, the New Jersey Supreme Court concluded "judicial review through a summary proceeding should be available prior to notification if sought by any person covered by the law." 142 N.J. at 30, 662 A.2d 367. The New Jersey Supreme Court directed the Office of the Attorney General to "formulate procedures designed to assure that notice is given in sufficient time prior to Tier [II] or Tier [III] notification to allow the offender to object." *Id.*

The notice informs the offender of the proposed Tier Classification, the specific manner and details of notification and advises him or her that "unless [an] application is made to a court on or before the date mentioned in the notice (which shall not be shorter than two weeks after the giving of the notice), the notification will take place." *Id.* at 30–31, 662 A.2d 367. Upon receipt of the notice, the offender may object to the proposed notification, at which time the court sets a date for a hearing, the Tier Determination Hearing, to decide the issue. *Id.* at 31, 662 A.2d 367.

The court presiding over the Tier Determination Hearing has the authority to determine the extent of witness production, the extent of cross-examination and the use of expert testimony. *C.A.*, 146 N.J. at 83, 679 A.2d 1153. The court may "affirm or reverse the prosecutor's determination." *Doe*, 142 N.J. at 31, 662 A.2d 367. "[I]n the case of a reversal[,] the court [must] indicate those respects in which the proposed notification does not conform to the laws and the requirements." *Id.* at 31–32, 662 A.2d 367.

At the Tier Determination Hearing, the burden of going forward rests with the State. *Id.* This is satisfied by a *prima facie* justification of the proposed level and manner of notification, based upon the evidence presented. *Id.* The burden then moves to the offender to demonstrate by a preponderance of the evidence that the State did not conform to the laws and guidelines. *Id.*

Plaintiffs contend the procedures developed violate due process. Plaintiffs contend the hearings are criminal in nature and, therefore, warrant the protections of the Fifth and Sixth Amendments. Moving Brief at 5. Plaintiffs argue in the alternative that, if the proceedings are deemed to be civil in nature, the hearings unconstitutionally place the burden on the offender. Moving Brief at 16.

### i. *Protection of Fifth and Sixth Amendment Inapplicable*

■ The Plaintiffs proffer the factors found in *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 167, 83 S.Ct. 554, 567, 9 L.Ed.2d 644 (1963) for a determination of whether the hearing proceedings are penal in nature,

warranting the protections of the Fifth and Sixth Amendment. Moving Brief at 5.[16] Plaintiffs appear to argue that the Act establishes criminal proceedings and, therefore, Megan's Law is penal in nature. Under *Mendoza–Martinez*, the factors deemed relevant are:

█ Whether the sanction involves an affirmative disability or restraint, [2] whether it has historically been regarded as a punishment, [3] whether it comes into play only on a finding of scienter, [4] whether its operation will promote the traditional aims of punishment—retribution and deterrence, [5] whether the behavior to which it applies is already a crime, [6] whether an alternative purpose to which it may rationally be connected is assignable for it, [7] and whether it appears excessive in relation to the alternative purpose assigned.

*Id.* at 168–69, 83 S.Ct. at 567–68.

The factors enunciated in *Mendoza–Martinez* are appropriate to the determination of whether the proceedings warrant the protection of the Fifth and Sixth Amendments. The New Jersey Supreme Court and the Third Circuit have criticized the use of the *Mendoza–Martinez* factors outside of that context. *See Artway v. Attorney General of State of New Jersey*, 81 F.3d 1235, 1262 (3d Cir.) (*"Mendoza–Martinez* is inapplicable outside the context of determining whether a proceeding is sufficiently criminal in nature to warrant the protections of the Fifth and Sixth Amendments"), *reh'g denied*, 83 F.3d 594 (1996); *Doe*, 142 N.J. at 60–61 & n. 14, 662 A.2d 367 ("clear thrust of repeated Supreme Court decisions is that the *Mendoza–*

*Martinez* 'test' has been rejected in all contexts other than those that present the question whether the proceedings are civil or criminal. . . .").

Recently, however, the Supreme Court employed some of these factors to determine whether the Sexually Violent Predator Act, legislated in Kansas, established a criminal proceeding and, thus, constituted punishment for purposes of the Double Jeopardy Clause and the *Ex Post Facto* Clause. *See Kansas v. Hendricks*, ––– U.S. –––, –––, 117 S.Ct. 2072, 2078, 138 L.Ed.2d 501 (1997). The Court was "unpersuaded" that the act, which permitted the civil confinement of sexually violent predators following their criminal sentence, was a criminal proceeding. The Court concluded the act was not punishment "predicated upon past conduct for which [an offender] has already been convicted and forced to serve a prison sentence." *Id.*, at –––, 117 S.Ct. at 2081.

█ Under the guidance of *Hendricks*, it appears the factors, or at least some of the factors, are instructive to the determination of whether a measure is penal in nature. *See United States v. Ward*, 448 U.S. 242, 249, 100 S.Ct. 2636, 2641, 65 L.Ed.2d 742 (1980) (factors, though "neither exhaustive nor dispositive," are nonetheless helpful.). *See, infra*, note 25. The balancing of the factors, as applied to Megan's Law, however, does not favor a finding that the Tier Determination Hearings are criminal proceedings.

### A. *Affirmative Restraint*

Plaintiffs argue the proceedings represent an affirmative disability or restraint upon

---

**16.** Plaintiffs argue: "As concluded by every district court in New Jersey which applied the [*Mendoza–Martinez*] test, analysis of these factors as they relate to Megan's Law confirms its penal nature." Moving Brief at 5 (citing *E.B.*, 914 F.Supp. at 85; *Artway v. Attorney General*, 876 F.Supp. 666 (D.N.J.1995), *vacated*, 81 F.3d 1235 (3d Cir.); *reh'g denied*, 83 F.3d 594 (3d Cir.1996). *Diaz v. Whitman*, Civ. No. 94–6376, slip op. (D.N.J.1995)). The persuasive effect of these cases is diminished in the instant matter for several reasons.

These cases involved individuals convicted before the effective date of the Act and, therefore, addressed the *ex post facto* aspect of Megan's Law—an issue absent from the instant case. *Diaz* and *Artway* did not have the benefit of the

New Jersey Supreme Court decision in *Doe v. Poritz*, 142 N.J. 1, 662 A.2d 367 (1995). *See, e.g., Diaz*, slip op. at 4 (stating concern that "there is no process put in place for sufficiently prompt judicial or otherwise neutral scrutiny of the decision as to which tier will be assigned to this plaintiff when he emerges from incarceration"). In *E.B.*, the court did not directly address the *Mendoza–Martinez* factors, but, rather, "[stood] by its previous decision" in *Artway*, 876 F.Supp. at 666. Although the district courts in *Artway* and *Diaz* did apply the *Mendoza–Martinez* factors, the Circuit found their use "inappropriate." *Artway*, 81 F.3d at 1261. Further, none of the courts employing the factors had the benefit of the recent Supreme Court decision in *Kansas v. Hendricks. See, infra*, at –––.

them. Plaintiffs argue: "Community notification has a significant impact on an individual's very ability to lead a normal law-abiding life in society. It subjects [P]laintiffs to vigilantism, forces them to leave the state to avoid the stigma of notification, impairs their opportunities for work and damages their reputations and ability to develop and maintain stable relationships." Moving Brief at 5–6.

■■■ "The essence of [F]ederalism is that [S]tates must be free to develop a variety of solutions to problems...." *Addington v. Texas*, 441 U.S. 418, 431, 99 S.Ct. 1804, 1812, 60 L.Ed.2d 323 (1979). Community notification is such a solution. Community notification arms-those most vulnerable with the knowledge necessary for self-protection. It is a legitimate, non-punitive governmental objective that does not constitute an affirmative restraint. *Hendricks*, —— U.S. at ——, 117 S.Ct. at 2083 (State's "measures to restrict the freedom of the dangerously mentally ill" not affirmative restraint).

Contrary to the argument of the Plaintiffs, the conduct or the effects about which the offenders complain are not affirmative restraints imposed by Megan's Law. Rather, the effects, if in fact they are realized, are unintended consequences that occur as a result of the offender's crime. The fact that undesirable repercussions may occur cannot be a basis for rendering the Act an affirmative disability or restraint imposed by the State. Any negative consequences that arise from the criminal conduct of a Plaintiff (or the awareness of such conduct) can be and should be controlled through the local police power, not through the abrogation of appropriate remedial legislation designed to protect society. *See Doe*, 142 N.J. at 43, 662 A.2d 367 ("the most searching inquiry is required before condemning honest laws that

are free of punitive intent and designed to protect society").

As well, the Notification Provision does not constitute an affirmative restraint because the information gathered and disseminated by the State is, for the most part, already available in the public domain. The Plaintiffs do not have a liberty or privacy interest in the information to prevent its disclosure because the information is public record.[17]

Although, the State's finding of a potential for re-offense is not part of the public record, that finding is a conclusion based upon an assessment of the public record. It does not impose an affirmative restraint upon the offender.

### B. *Historically Viewed as Punishment*

Plaintiffs argue notifying communities of an offender's crimes and categorizing the offender as dangerous subjects him or her to public opprobrium, humiliation and shame. Plaintiffs contend "[s]uch a measure has historically been understood as being punishment." Moving Brief at 7. Contrary to the argument of Plaintiffs, "[the] [G]overnment has always had the authority to warn the community about the presence of dangerous persons, and such warnings have never been understood as imposing unconstitutional 'punishment.'" *W.P.*, 931 F.Supp. at 1217 (citing, as an example, "Wanted" posters which warn that a fugitive is armed or dangerous).

■■■ A statute does not constitute punishment "even though its remedial provisions have some inevitable deterrent impact, and even though it may indirectly and adversely affect, potentially severely, some of those subject to its provisions." *Doe*, 142 N.J. at 43, 662 A.2d 367. The first provision in Megan's Law outlines its remedial intent—to hedge the danger of recidivism posed by sex

---

**17.** Plaintiffs argue "the existence of a criminal record that sits in a courthouse someplace, gathering dust, is far different than when the State combines information together in one document ... and [then disseminates] that information to the public." 20 June Tr. at 15. (citing *United States Dept. Of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989)). The *Reporters Comm.* case cited by the Plaintiffs involved the

protection of criminal records pursuant to the Freedom of Information Act and did not address the question of whether the "individual's interest in privacy is protected by the Constitution." *Id.*, at 763 n. 13, 109 S.Ct. at 1476 n. 13. In any event, the information is public and readily available. It is not disseminated to the public at large. Rather, only those "likely to encounter" the offender are discretely notified.

offenders through the implementation of a system of registration, identification and, if necessary, notification. Its purpose is to prevent similar crimes in the future by notifying the community, when necessary, of the danger of potential re-offense. It is meant to enhance protection through knowledge not to promote vigilantism. Any violent repercussions argued by the Plaintiffs as a "natural and anticipated outgrowth" of Megan's Law, *see* First Amended Complaint, ¶ 40, can, and should, be prevented through action taken by local law enforcement, not the eradication of this appropriate remedial legislation.

The humiliation and shame felt by the offender originates in the underlying crimes committed, not in the notification procedure or in the reaction of the public to such conduct. *See Doe v. Kelley,* 961 F.Supp. 1105, 1110 (W.D.Mich.1997) ("Unlike historical uses of branding, shaming and banishment, the notification provisions do not affirmatively impose any suffering, restraint or obligation on the offender"). Although ostracism may be a possible consequence of notification, that is not the intended purpose of Megan's Law. It is simply result—oriented sophistry to argue the Act was designed or implemented to promote ostracism. If ostracism occurs, it is the direct, foreseeable result of the abhorrent conduct of an offender.

As well, there are numerous "critical, dispositive differences" between community notification and the "public shaming" punishments of the colonial era. *W.P.,* 931 F.Supp. at 1216. Unlike Megan's Law, the historical punishment of public shaming lacked a remedial purpose and served solely to punish an individual through degradation. Historic shaming punishment was widespread as notification was made to the whole of society. Megan's Law, in contrast, is tailored to limit notification, if it occurs at all, to protect those most vulnerable and "likely to encounter the offender." *Doe,* 142 N.J. at 29–30, 662 A.2d 367. Finally, the effects of the historical shaming punishment were inevitable as they were "an integral part of the sentence."

*W.P.,* 931 F.Supp. at 1217. The repercussions of Megan's Law, however, are indirect consequences not part of the Act itself. "Megan's Law is not a lust for retribution; it is a measured attempt to achieve remedial with attendant deterrent goals." *Id.* Although violence against an offender is not tolerable, the offender should not, and cannot, expect community approval.

### C. *Scienter*

Plaintiffs argue: "While [the] criminal *mens rea* may have long since disappeared by the time the [offender] is released and tiered, it is assumed by the legislature to continue throughout incarceration, and at least fifteen years thereafter." Moving Brief at 8 (citing N.J.S.A. 2C:7–2). The high recidivism rate of sex offenders is well-documented and a cited justification behind the Act. *See Doe,* 142 N.J. at 15 & n. 1, 662 A.2d 367 ("the relative recidivism rate of sex offenders is high compared to other offenders; treatment success of sex offenders exhibiting repetitive and compulsive characteristics is low; and the time span between initial offense and re-offense can be long."). This is recognized by Plaintiffs in the Verified Complaint. There Plaintiffs demanded a class because the proposed members were "so numerous" that other mechanisms would be unworkable and because the "number of the class members will continue to rise indefinitely." Verified Complaint, ¶ 7.[18]

Plaintiffs argue, however: "In addition to having no factual basis for this assumption [of a high recidivism rate] other than disputed statistics regarding rates of recidivism, the notification laws are nonetheless triggered by a criminal conviction and, thus, a finding of scienter." Moving Brief at 8.

Contrary to Plaintiffs' argument, it is not a finding of scienter or *mens rea* which triggers the notification laws. Megan's Law applies to those who committed one of the enumerated offenses, regardless of whether criminal *mens rea* existed at the time of the crime. *See* N.J.S.A. 2C:7–2 (legislation encompasses persons found not guilty by rea-

---

**18.** As stated, Plaintiffs filed the subsequent First Amended Complaint which does not request class certification.

son of insanity). *See also Hendricks,* ── U.S. at ──, 117 S.Ct. at 2082 (no finding of scienter where commitment determination is made based on mental abnormality rather than criminal intent). Further, scienter is not present because of the fact that the State must demonstrate for the purpose of determining the Tier Classification and level of notification. Rather, the State employs a series of factors to determine the risk of re-offense. Any "focus on prior offenses is not due to any attempt at punishment but is rather a scientific attempt to better protect the public safety from [offenders] likely to re-offend." *C.A.,* 146 N.J. at 105, 679 A.2d 1153. The absence of scienter is evidence that notification pursuant to Megan's Law is not intended to be retribution or punishment. *Hendricks,* ── U.S. at ──, 117 S.Ct. at 2082.

### D. *Deterrence and Retribution*

Plaintiffs contend: "[T]he very purpose of public notification is to describe to the community the details of a person's sexual crime, to inform them that a dangerous sex offender is living in its midst, and to cause both the offender and the public to change their behavior in response to this notification." Moving Brief at 8. Plaintiffs argue the retributive and deterrent effects of notification cannot be explained as solely remedial. *Id.*

A statute does not constitute punishment "even though its remedial provisions have some inevitable deterrent impact, and even though it may indirectly and adversely affect, potentially severely, some of those subject to its provisions." *Doe,* 142 N.J. at 43, 662 A.2d 367. *See also United States v. Ursery,* ── U.S. ──, ──, 116 S.Ct. 2135, 2149, 135 L.Ed.2d 549 (1996) (a deterrent purpose "may serve civil as well as criminal goals") (citations omitted).

The stated purpose of the Act is remedial. It was enacted as a self-defense mechanism for the protection of those individuals in a community who would otherwise suffer because of their ignorance. *See* N.J.S.A. 2C:7-1. Megan's Law does not "affix culpability for prior criminal conduct. Instead, such conduct is used solely for evidentiary purposes, ... to support a finding of future dangerous-

ness." *Hendricks,* ── U.S. at ──, 117 S.Ct. at 2082. Nor is "a criminal conviction a prerequisite" before the provisions of the Act take effect. *Id.; see* N.J.S.A. 2C:7-1 (Megan's Law encompasses those found not guilty by reason of insanity).

The provisions of Megan's Law do not implicate retribution or deterrence. If re-offense is deterred because the offender has changed his or her future behavior, that is an added benefit; such will not displace the primary remedial purpose of the legislation. *United States v. Borjesson,* 92 F.3d 954, 956 (9th Cir.) (although the asserted non-punitive goals "may resemble the legitimate objectives of punishment[,] including deterrence and incapacitation[,]" that does not change the essentially remedial character of debarment, the procedure in issue.), *cert. denied,* ── U.S. ──, 117 S.Ct. 622, 136 L.Ed.2d 545 (1996); *Department of Revenue v. Kurth Ranch,* 511 U.S. 767, 777 n. 14, 114 S.Ct. 1937, 1945 n. 14, 128 L.Ed.2d 767 (1994) ("[W]hether a sanction constitutes punishment is not determined from the defendant's perspective, as even remedial sanctions carry the 'sting of punishment.' ") (quotation omitted).

Plaintiffs were convicted after the enactment of Megan's Law. As with any conviction, the offender was aware at the time of the offense that certain collateral disabilities may result upon a finding of guilt—loss of voting privileges, inability to hold public office, loss of a professional license, deportation, etc. Here, the offender was aware, prior to the commission of the crime, that he or she may be subject to community notification. Notification is not punishment; it is a collateral, civil consequence resulting from the sex offense.

### E. *Behavior to Which Act Applies is Already a Crime*

The Plaintiffs argue: "[E]very individual subject to Megan's Law must be deemed to have committed a sexual offense .... The entire thrust of the law is to single out those who have committed a particular type of criminal offense in an effort to deter similar future criminal behavior." Moving Brief at 9. Plaintiffs further argue: "The behavior to

which the law applies is . . . already a crime." *Id.*

■ Megan's Law was passed to provide knowledge as a measure of self-defense to help protect those most vulnerable in the community. It does not seek to retry an offender for a crime for which he or she has already been convicted and punished. Although it is the prior conviction which triggers the Act, no notification is made without a current individualized assessment of the comparative risk of re-offense. This assessment does include considerations of prior conduct. *See Hendricks,* —— U.S. at ——, 117 S.Ct. at 2080 (citing *Heller v. Doe,* 509 U.S. 312, 323, 113 S.Ct. 2637, 2644, 125 L.Ed.2d 257 (1993) ("[p]revious instances of violent behavior are an important indicator of future violent tendencies"); *Schall v. Martin,* 467 U.S. 253, 278, 104 S.Ct. 2403, 2417, 81 L.Ed.2d 207 (1984) (explaining that "from a legal point of view there is nothing inherently unattainable about a prediction of future criminal conduct.")). *See also Allen v. Illinois,* 478 U.S. 364, 371, 106 S.Ct. 2988, 2993, 92 L.Ed.2d 296 (1986) (statute non-punitive although triggered by a sexual assault). It also includes, however, "the offender's record after conviction, after release, the record up to the very date of the Tier [C]lassification and notification, including responsiveness to treatment, whether positive or negative." *Doe,* 142 N.J. at 74, 662 A.2d 367. *See also W.P.,* 931 F.Supp. at 1217 (recognizing that sentencing for the commitment of a crime and determination of a Tier Classification involves separate risk assessments). The focus is on the likelihood of future misconduct, rather than on the culpability of a past act. *See Hendricks,* —— U.S. at ——, 117 S.Ct. at 2082 (where law did not "affix culpability for prior criminal conduct," it was not a criminal

proceeding); *Allen,* 478 U.S. at 371, 106 S.Ct. at 2993 (prior criminal conduct used not to punish but "to show the . . . mental condition and to predict future behavior"); *De Veau v. Braisted,* 363 U.S. 144, 160, 80 S.Ct. 1146, 1155, 4 L.Ed.2d 1109 (1960) ("The question in each case where unpleasant consequences are brought to bear upon an individual for prior conduct, is whether the legislative aim was to punish that individual for past activity or whether the restriction of the individual comes about as a relevant incident to a regulation of a present situation."). Although the Act "is tied to criminal activity, . . . this fact is insufficient to render [Megan's Law] punitive." *Ursery,* —— U.S. at ——, 116 S.Ct. at 2149.

### F. Articulation of a Non–Penal Purpose

Plaintiffs contend "[t]o the extent that the legislature is able merely to articulate a non-penal purpose, it is a test virtually impossible to fail." Moving Brief at 9. The Plaintiffs contend that it is the mechanism by which the non-penal purpose is achieved which must be analyzed. In support of this argument, Plaintiffs cite the statement of one legislator who indicated if the law "makes pedophiles leave and practice their art somewhere else, then we have accomplished something." Moving Brief at 9 (citing *Megan's Law: How Fair, How Effective?,* Philadelphia Enquirer, October 9, 1994). Plaintiffs argue this statement evidences a recognition of the punitive aspects of the Act. *Id.*

Plaintiffs further argue there is no evidence to demonstrate the law will achieve its goal. *Id.* at 10 (citations omitted).[19] Rather, Plaintiffs argue the evidence supports the conclusion that successful reintegration will

---

19. One study relied on by the Plaintiffs recognized that "[o]ffenders who were subjects of community notification were arrested for new crimes much more quickly than comparable offenders who were released without notification." Schram & Milloy, "Community Notification: A Study of Offender Characteristics and Recidivism" (Washington State Institute for Public Policy, October 1995), attached to Moving Brief at A–45, at 16. This is wholly consistent with the stated purpose of Megan's Law to "promptly resolv[e] incidents involving sexual abuse." N.J.S.A. 2C:7–1.

In any event, "[t]he Constitution permits a State to follow one reasonable professional view, while rejecting another." *Hendricks,* —— U.S. at ——, 117 S.Ct. at 2088 (Breyer, J., dissenting) (citing *Addington,* 441 U.S. at 431, 99 S.Ct. at 1812.) Although the "psychiatric debate . . . helps to inform the law by setting the bounds of what is reasonable, . . . it cannot . . . decide just how States must write their laws within those bounds." *Id.* (citing *Jones v. United States,* 463 U.S. 354, 365 n. 13, 103 S.Ct. 3043, 3050 n. 13, 77 L.Ed.2d 694 (1983)).

be obstructed because the stress accompanying notification may actually increase the rate of recidivism. *Id.*

Plaintiffs' arguments are hollow. The non-penal purpose of the Act, as discussed, is clear. The stray remark of one legislator is not sufficient to undermine an appropriate purpose, which is supported by carefully drawn procedures designed to ensure notification is calibrated to the attendant risk of the offender.

With respect to Plaintiffs' contention that there is a lack of evidence that Megan's Law will achieve its non-penal goal of protecting its citizens, those results are virtually impossible to establish. To credit such an argument would be to require the Defendants to prove a negative. It would require a determination of how many future offenses were prevented based upon the fact that parents, teachers or other responsible individuals in the community took extra precautions to protect children or other vulnerable members of society. Certainly parents, schools, organizations or communities notified that an offender lives in a neighborhood will take extra precautions to protect potential victims. As a result of such precautions, re-offense will decrease.[20]

As stated, it is clear from the very language of the Verified Complaint that the Plaintiffs do not consider the Act to be a successful deterrent to recidivism. Verified Complaint, ¶ 7 ("the number of class members will continue to rise indefinitely"). The Notification Provisions are self-evidently important.

### G. *Excessiveness in Relation to the Non–Punitive Purpose*

Plaintiffs identify four ways that Megan's Law is overbroad. First, Plaintiffs contend the RRAS bases its determination largely on past actions and does not take into account a current psychological profile or behavior that would tend to lower a offenders overall risk assessment. Moving Brief at 11. Plaintiffs submit, "[t]he Risk Assessment Scale is ad-mittedly skewed to favor consistent results over individual accuracy." *Id.* (citing *In the Matter of E.W.*, Transcript of Proceedings at 156–57, 19 March 1996). Second, Plaintiffs argue the RRAS does not apply differing factors based upon categories of offenders: "those who committed illegal consensual acts are treated as posing the same risk as rapists and pedophiles." Moving Brief at 12. Third, it is observed that juveniles are rated under the same scale as adults, without any evidence to substantiate re-offense criteria. Fourth, the scope of notification can include dissemination of information to day care centers, grade schools and summer camps even for offenders who sole offenses occurred against adults.

Plaintiffs contend that notification to schools and other child care establishments includes information, such as offender's home address and place of employment which "bears no rational relation to the possibility that an offender 'may be drawn' ... [but] serves only to ostracize, isolate and increase the likelihood of vigilante action." Moving Brief at 12.

These observations are not sufficient to support a finding that the Community Notification provisions are criminal in nature, warranting the protections of the Fifth and Sixth Amendments. The RRAS was designed to provide consistent results; it also provides some level of predictability. A sex offender knows that, if convicted, he or she will be subject to Megan's Law Registration Provision and, possibly, the Notification Provision.

The New Jersey Supreme Court established judicial review of Tier Classifications prior to notification through a summary proceeding. *Doe,* 142 N.J. at 30, 662 A.2d 367. The Law Division, the trial court, is permitted to stay the effect of an affirmance of the Tier Classification to allow time for the offender to apply to the Appellate Division. *Id.* at 32, 662 A.2d 367. These proceedings are more than adequate to protect any interest of the offender.

---

20. The USA Appendix contains affidavits from individuals in other states, including a detective with the Seattle Police Department and a parole officer with the New York State Division of Pa-role. Those individuals documented their experience of how notification prevented crimes. *See* USA Appendix, Exhibits 21 and 22.

Offenders have already been afforded the full panoply of rights required by the Constitution in the trial for the underlying crime. The purpose of the Tier Determination Hearing is not to reconvict but to determine whether members of the community should be given largely public information about an offender in order to protect themselves.

Based upon the *Mendoza–Martinez* factors, the Tier Classification proceedings are not criminal in nature and do not require the full panoply of protections of the Fifth and Sixth Amendments. The cases cited by the Plaintiffs are not persuasive because, unlike Megan's Law, the acts at issue in those cases invoked punishment and triggered proceedings that were criminal in nature. *See Specht v. Patterson,* 386 U.S. 605, 609, 87 S.Ct. 1209, 1212, 18 L.Ed.2d 326 (1967) ("the punishment under the second Act is criminal punishment even though it is designed not so much as retribution as it is to keep individuals from inflicting future harm." The Act contained provisions for probation and granted the Board of Parole "broad power over the person sentenced."); *United States ex rel. Gerchman v. Maroney,* 355 F.2d 302, 309 (3d Cir.1966) ("[T]he Barr–Walker proceedings are criminal rather than civil in nature and constitute an essentially independent rather than a sentencing proceeding. The Act leaves no doubt, both in its language and purpose, that ·it is a criminal statute and what is imposed under its authority is criminal punishment").

Plaintiffs also attempt to distinguish *McMillan v. Pennsylvania,* 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986). *McMillan* involved the constitutionality of Pennsylvania's Mandatory Minimum Sentencing Act, which provided "that anyone convicted of certain enumerated felonies is subject to a mandatory minimum sentence of five years imprisonment if the sentencing judge finds, by a preponderance of the evidence, that the person 'visibly possessed a firearm' during the commission of the offense." *Id.* at 81, 106 S.Ct. at 2413. The act did not authorize a sentence in excess of that allowed for the offense, it operated to divest the court of discretion to impose a sentence less than five years. *Id.* at 82, 106 S.Ct. at 2414. Because the act did not alter the maximum penalty, the Supreme Court held the act not to be additional punishment. *Id.* at 87–88, 106 S.Ct. at 2417.

Plaintiffs contrast *McMillan* by arguing that a Megan's Law court must make "a new finding of fact that was not an ingredient of the offense charged[,] which results in an independent punishment not available at the time of sentencing." Moving Brief at 15. The additional finding they reference is the finding of future dangerousness, which "relies [on] new evidence which only comes into existence months or years after sentencing and after the punishment for the predicate offense is completed." *Id.* Plaintiffs contend the determination of dangerousness requires the full panoply of criminal protections. *Id.*

As stated, Megan's Law does not invoke an additional penalty through the finding of future dangerousness. The Act notifies the community, where necessary, of information that is already public knowledge. The level of potential recidivism aids the Prosecutor in determining what scope of notification to employ.

Regulatory or public safety measures which are imposed after proceedings triggered by conviction or acquittal are not unusual. In such proceedings, the procedural protections available at the criminal trial stage are not duplicated. *See, e.g., Jones,* 463 U.S. at 354, 103 S.Ct. at 3044 (acquittal by reason of insanity followed by commitment on the grounds of mental illness or dangerousness); *Bae v. Shalala,* 44 F.3d 489 (7th Cir.1995) (debarment from contracting following conviction for felony related to the approval of a drug product); *De Veau,* 363 U.S. at 144, 80 S.Ct. at 1147 (upholding law barring convicted felon from holding position with waterfront labor union). Simply because the proceedings at issue may make a finding of future dangerousness does not transform the Tier Determination Hearing into a criminal proceeding.

ii. *Tier Determination Hearings are Civil in Nature*

A. *The State's Burden of Production*

■ Plaintiffs argue the procedural protections imposed by the New Jersey Su-

preme Court "provide nothing more than a faint veneer of due process" because the "procedures unconstitutionally require the [offender] to prove that he does not present *some* risk of re[-]offense while denying him access to an evidentiary process by which he might hope to meet this burden." Moving Brief at 16. Plaintiffs cite "six procedural advantages [to the State which] are not constitutionally justified ... when assessed [under] the standard factors described in *Mathews v. Elridge [Eldridge]*, 424 U.S. 319 [96 S.Ct. 893, 47 L.Ed.2d 18] (1976)." Moving Brief 18.

Plaintiffs' first criticism of the judicial review process is the placement of the burdens. Plaintiffs argue "the State is not required to prove the prospect of re[-]offense even by a preponderance of the evidence, but sustains a burden of production simply by providing some proof that the [offender] presents a substantially higher possibility of re[-]offense than another offender. The burden of proof and persuasion then shifts to the [offender] by a preponderance of the evidence." *Id.* (citing *Doe*, 142 N.J. at 32, 662 A.2d 367 (internal quotations omitted)).

 It is not impermissible to attach the burden of proof to a party who initiates a civil proceeding. *W.P.*, 931 F.Supp. at 1222–23. The Tier Determination Hearing is held at the request of the offender, who is seeking review of his or her Tier Classification. Indeed, as recognized by the *W.P.* court, the offender enjoys a procedural benefit at the Tier Determination Hearing because it is the Prosecutor who bears the initial burden of establishing a *prima facie* case for the proposed Tier Classification. *Id.; Doe*, 142 N.J. at 33–34, 662 A.2d 367. *Compare Schall*, 467 U.S. at 263, 104 S.Ct. at 2409 (upholding statute which permits "permits a brief pretrial detention based on a finding of a 'serious risk' that an arrested juvenile may commit a crime before his return date."); *Morrissey v. Brewer*, 408 U.S. 471, 485–87, 92 S.Ct. 2593, 2602–03, 33 L.Ed.2d 484 (1972) (following informal hearing to establish whether there is probable cause for commission of parole violation, parolee has burden to show why violation does not warrant parole revocation). Given the State's

initial burden, it is not impermissible to burden the offender with the obligation of refuting the *prima facie* case by a preponderance of the evidence.

The Plaintiffs' second criticism is that the State is not required to produce evidence that the offender is likely to re-offend, but rather demonstrate *some* risk of re-offense. Plaintiffs argue there is no absolute reference by which risk can be assessed. Moving Brief at 17 ("Therefore the probability of re[-]offense on the part of moderate or high-risk offenders is not the issue before the court, but rather the relatively greater risk of re[-]offense compared either to the low-risk offender class or the moderate-risk offender class.") (citing *Doe*, 142 N.J. at 34, 662 A.2d 367).

It is the relative risk of re-offense that is in issue at a Tier Determination Hearing. The level of the risk determines the scope of notification. The Prosecutor need not demonstrate a likelihood of re-offense. Neither is the offender charged with the burden of showing no risk of re-offense. Rather, the offender must show he or she does not pose "a risk of re-offense substantially higher" than a low or moderate risk offender. *Doe*, 142 N.J. at 33, 662 A.2d 367.

 The third criticism is that the Prosecutor is presumptively accepted by the court as an expert on the risk of re-offense. Moving Brief at 17 (citing *Doe*, 142 N.J. at 35, 662 A.2d 367). To the extent it may be referred to as a presumption, the presumption is not misplaced. The Prosecutor has not only acquired a "fair degree of experience [dealing] with sex offenders," *Doe*, 142 N.J. at 35, 662 A.2d 367, he or she is also armed with an "adequate knowledge of the research in this area." *Id.* He or she is guided by factors which are recognized by experts in the field of risk assessment as reliable predictors of recidivism. *C.A.*, 146 N.J. at 105, 679 A.2d 1153. He or she is also most familiar with the particular situation at issue in the Tier Determination Hearing. *See* 10 April Eisenberg Aff., ¶¶ 4–5; 10 April Squitieri Aff., ¶ 12. This background is more than sufficient to deem the Prosecutor an expert for the purposes of the Tier Determination Hearing. *See Landrigan v. Celotex*

*Corp.*, 127 N.J. 404, 421–22, 605 A.2d 1079 (1992) (ultimate decision as to whether individual is qualified to render an opinion is dependant upon trial court's assessment of his or her qualifications and methodology); *cf. Holbrook v. Lykes Bros. S.S. Co., Inc.*, 80 F.3d 777, 781 (3d Cir.1996) ("insistence on a certain kind of degree or background is inconsistent with our jurisprudence in this area. The language of Rule 702 [of the Federal Rules of Evidence] and the accompanying advisory notes make it clear that various kinds of 'knowledge[,] skill, experience, training or education,' . . . qualify an expert") (citation omitted).

The presumption serves the practical function of ensuring the Tier Determination Hearing is not "converted into long drawn out contests between experts." *Doe*, 142 N.J. at 35, 662 A.2d 367. In any event, the court retains full authority "to reject [the Prosecutor] as an expert." *Id.*

▮▮▮▮▮ Plaintiff's fourth criticism is that the State's burden of production may be satisfied by hearsay, and possibly anecdotal, documentary evidence, that the offender exhibits characteristics of a possible re-offender, which evidence would be inadmissible even in a purely civil proceeding. Moving Brief at 17–18 (citing *C.A.*, 146 N.J. at 95, 679 A.2d 1153).

The Tier Determination Hearing "is not like an administrative hearing but is more like an evidentiary and investigatory hearing. It is civil, not criminal, and remedial, not adversarial." *C.A.*, 146 N.J. at 94, 679 A.2d 1153. Both the offender and the Prosecutor are permitted to use documentary evidence and hearsay to meet their respective burdens, if deemed to be trustworthy and reliable.[21] *C.A.*, 146 N.J. at 94–96, 679 A.2d 1153; *Doe*, 142 N.J. at 31, 662 A.2d 367. As well, the offender is afforded numerous other procedural protections, such as written notice of the proposed notification two weeks in advance, the right to object to the notifica-

tion, automatic stay of the notification if a timely objection is filed, the right to be represented by counsel, or the appointment of counsel if one cannot be afforded, and extensive pre-hearing discovery including "all papers, documents, and other material, including the prosecutor's findings and statement of reasons for the level and manner of proposed notification to the . . . offender and [his or her] counsel." *See Doe*, 142 N.J. at 31, 662 A.2d 367. At the Tier Determination Hearing, the trial court has the discretion to permit expert production, cross examination and the use of expert testimony. The offender may also appeal the decision of the trial court.

▮▮▮ The Plaintiffs' fifth objection is that the offender is allowed to confront and cross-examine an alleged victim only in the rarest of cases. Moving Brief at 18. Neither side, however, may compel the testimony of the victim without leave of court. *C.A.*, 146 N.J. at 97, 679 A.2d 1153. This is a reasonable condition designed to protect the victim. Indeed, "[t]he State often avoids a trial, particularly in a sex offense case, so that the victim will not be forced to testify." *Id.* In any event, victim testimony is not completely foreclosed. A victim may be compelled to testify at a Tier Determination Hearing by either the offender or the Prosecutor if the court finds it to be "absolutely necessary." *Id.* In civil proceedings, it is not unusual that, for good cause, the confrontation and cross examination of adverse witnesses may be limited. *Cf. Morrissey*, 408 U.S. at 487, 489, 92 S.Ct. at 2603, 2604 (parole revocation hearing).

▮▮▮ The sixth objection is that an offender is only permitted to use an expert to override the RRAS Tier Classification when his or her case is sufficiently unusual such that it falls outside the "heartland of cases." Moving Brief at 18 (citing *G.B.*, 147 N.J. at 82, 685 A.2d 1252). The New Jersey Su-

---

**21.** Both the New Jersey Rules of Evidence and the Federal Rules of Evidence are relaxed, or inapplicable, in certain situations and proceedings. *See* New Jersey Rules of Evidence, Rule 101 ("these rules may be relaxed in the following instances to admit relevant and trustworthy evidence in the interest of justice"); *See* Federal Rules of Evidence, Rule 1101 (Rules of evidence do not apply to preliminary questions of fact, grand jury proceedings, extradition or rendition proceedings, sentencing, granting or revoking probation, issuance of warrant for arrest, searches or criminal summonses, bail proceedings).

preme Court has stated that an offender is permitted to introduce expert evidence about his or her Tier Classification:

(i) if such evidence tends to establish that the Scale score does not accurately or adequately take into account significant aspects of the [offender's] character or prior offense; (ii) if such aspects would be relevant and material to the trial court's determination of [T]ier [C]lassification; and (iii) if such evidence would, in the trial court's discretion, assist in the disposition of the case. Such evidence can be introduced, at the trial court's discretion, in the form of hearsay, written opinion, deposition-type testimony, or live testimony. If the trial court determines that the proffered evidence is not relevant to the issues raised, nor essential to their resolution, then it shall explain on the record the decision to exclude the evidence.

*G.B.*, 147 N.J. at 87–88, 685 A.2d 1252. This standard is far from insurmountable, as evidenced by the instant case. Significantly, only one of the eleven Plaintiffs in the instant matter, David D., was denied an expert because he "failed to meet the minimum requirement." [22] 28 May Squitieri Aff., ¶ 3.

To facilitate the remedial purpose of Megan's Law, the Tier Determination Hearing was constructed as a summary proceeding. This rule prevents the summary proceeding from being transformed into a battle of the experts. The rule, however, is merely a preference and does not completely foreclose or discourage the production of expert testimony. The court is granted "substantial power ... to allow, reject, control, and limit expert testimony in order to render these proceedings administratively effective, practical, and timely." *Doe*, 142 N.J. at 35, 662 A.2d 367.

### B. *Mathews v. Eldridge Standard*

In *Mathews*, the Supreme Court enunciated three factors to consider when identifying the specific dictates of due process: 1) the private interest affected by the state action, 2) the risk of an erroneous deprivation of such interest through the procedures used, and 3) the Government's interest in employing the procedures. *Mathews*, 424 U.S. at 335, 96 S.Ct. at 903. A balancing of these factors demonstrates that the procedures imposed satisfy the minimum requirements of due process.

### 1. *Privacy Interests*

Plaintiffs argue the Notification Provisions may result in the publication of an offender's residence, school and job site, as well as the Prosecutors' perception of dangerousness to the community. Moving Brief at 19. Courts that have addressed the Notification Provision of Megan's Law have found it to implicate a privacy interest. *See Doe*, 142 N.J. at 107, 662 A.2d 367; *W.P.*, 931 F.Supp. at 1219. The courts that have encountered the issue have determined that a privacy interest exists, even apart from the fact that "[t]hose convicted of crime may have no cognizable privacy interest in the fact of their conviction." *G.B.*, 147 N.J. at 74, 685 A.2d 1252 (citing *Doe* ). Those courts, however, have found that the privacy interests "fade when the information is a matter of public record." *Id.* As well, such privacy interests must be balanced against the interests of the community and individuals in need of protection from recidivism that appears to be undeterred by either criminal prosecution or community notification under Megan's Law. *See* Reply Brief at 8 ("The Attorney General fails

---

**22.** Pursuant to David D.'s request for an expert, the court held a hearing. The court had been provided two reports, one from the Atlantic Mental Health Association, dated 24 October 1995, and a confidential psychological evaluation from the Albert C. Wagner Institution, dated 23 April 1996. David D. Tier Tr. at Pa135. In making the decision to deny the expert, the court reviewed the underlying sex offense of David D., *id.* at Pa144–146, his sporadic employment history, *id,* at Pa146, his substance abuse, his relationships with his family, including his mother, *id.* at Pa147 ("Mother indicated her son caused her a

great deal of pain. He's not welcome in her home."), his relationship with the mother of his four children, *id.* at Pa146-7 ("There were two domestic violence incidents that year.... [S]he advised of a fear of [David D.] and complete resolve to separate herself from him on a permanent basis"), his scholastic record, *id.,* and his criminal history, *id.* at Pa147–148. The court determined a psychological or psychiatric report would not be of any benefit and could not "imagine a truly responsible evaluator indicating all of a sudden he's got a very positive psychological profile." *Id.* at Pa150.

to recognize that community notification is excessive because it is completely ineffective.").

▇ In *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), the Supreme Court held that reputation alone, apart from a more tangible interest such as employment, does not implicate any liberty or property interests sufficient to invoke the procedural protection of the Due Process Clause. *Id.* at 709, 96 S.Ct. at 1164. The New Jersey Supreme Court in *Doe* found a protectable interest in the harm to plaintiff's reputation "when coupled with the incursion on his right to privacy." *Doe,* 142 N.J. at 103, 662 A.2d 367. The court in *W.P.* also found a protected liberty interest by "coupling the reputational damage with the loss of employment opportunities or, more directly, the continuing legal status as an [offender] and the duties imposed as a result." *W.P.,* 931 F.Supp. at 1219.

The Notification Provision imposed by Megan's Law does not trigger a protected interest and is no greater than other deprivations already borne by the offender due to his or her status as a felon. The information contained in the notification—the offender's conviction, residence, place of business or school—is already public knowledge. An offender is required to tell an employer, when asked, his or her criminal history. Any attendant deprivations, such as the loss of an opportunity for employment, is not caused by the Notification Provision, but by his or her status as a felon.

Plaintiffs argue the Notification Provision "is the modern-day equivalent of branding and banishment" which will make it impossible for the offender to reintegrate into society. Moving Brief at 19 (citing *Doe v. Pataki,* 940 F.Supp. 603, 605 (S.D.N.Y.1996)).

The "sex offenders' loss of anonymity is no constitutional bar to society's attempt at self-defense." *Doe,* 142 N.J. at 13, 662 A.2d 367. The stated purpose of Megan's Law is not to brand and banish the offender, but to inform and protect the community. Because the scope of notification is tailored to each particular situation, the privacy interest of the offender, to the extent such an interest exists, is not unnecessarily encumbered.[23]

### 2. *Risk of Erroneous Deprivation*

The remaining *Mathews* factors do not weigh against the procedures used. The second factor is the risk of an erroneous deprivation. Plaintiffs cite the "six artificial advantages given to the State" to support their argument that the risk of erroneous deprivation is highly probable. Moving Brief at 20.

The Constitution requires only that the offender receive "some form of hearing." *Mathews,* 424 U.S. at 333, 96 S.Ct. at 902. In spite of the asserted "artificial advantages" of the state, the fact remains that the offender is allowed numerous protections— notice of the Tier Classification and full disclosure for the basis of finding the Tier Classification, including "all papers, documents, and other material" used by the Prosecutor, the opportunity to challenge the Tier classification, an automatic stay of notification if the offender timely challenges the classification, counsel at the Tier Determination Hearing, the ability to produce witnesses, cross examine and present expert testimony, as permitted by the trial court, at the Tier Determination Hearing and the opportunity to appeal the decision of the trial court. These protections, coupled with the fact that the offender has already pleaded guilty, been convicted beyond a reasonable doubt of the crime that

---

**23.** That one of the omitted Plaintiffs, Harry H., is a juvenile does not command a different result. Megan's Law specifically applies to juveniles adjudicated to be delinquent because of a sex offense. N.J.S.A. 2C:7–2. While there may exist public policy concerns which disfavor public release of information concerning juveniles, Moving Brief at 32–33 & n. 3, that policy is neither steadfast nor constitutional. This is evidenced by other statutes in New Jersey which allow the release of the identity of a juvenile charged with an offense, the offense charged, the adjudication and disposition of the offense. *See* N.J.S.A. 2A:4A–60(c), (d), (e). *See also* N.J.S.A. 2A:4A–60(f) ("Information as to the identity of a juvenile adjudicated delinquent, the offense, the adjudication and the disposition shall be disclosed to the public where the offense for which the juvenile has been adjudicated delinquent if committed by an adult, would constitute a crime of the first, second or third degree, or aggravated assault ...."); *cf.* N.J.S.A. 2A:4A–60(i) (public attendance at juvenile proceeding).

triggers the Megan's Law provisions or found not guilty by reason of insanity, mean that the risk of erroneous deprivation at the Tier Determination Hearing is not significant.

 The purpose of the Tier Determination Hearing is not to re-try the offender. It is to determine what level of notification is required in the interest of society. As conceded by the Plaintiffs, "the State [has] an equal interest in ensuring that notification does not occur in inappropriate situations . . . as it does in ensuring that the public is notified about a risk that all agree is difficult to quantify." Moving Brief at 23. This interest is further assurance that the Tier Determination Hearings will not be abused.

#### 3. State's Interest

Plaintiffs argue the State's interest in placing the burden of persuasion on the offender is minimal because its "interest is in getting the determination right, not in notifying in all cases." Moving Brief at 23 (citing *Artway*, 81 F.3d at 1251). Plaintiffs contend the State should be indifferent as to where the burden of persuasion lies. *Id.* Plaintiffs also contend fiscal and administrative considerations should be given little emphasis. They argue: "The current procedures seem gratuitously slanted in favor of the State's mere convenience, despite its greater resources, at the expense of the [offender's] irretrievable privacy and reputational [rights]." *Id.*

Plaintiffs' arguments lose sight of the fact that this is not a criminal proceeding that imposes guilt, nor even a civil proceeding that imposes liability. It is an investigatory proceeding implemented to protect the public. The process is designed to be a summary proceeding. The burdens imposed are constitutional, especially in situations like the instant matter, where the offender was convicted after the passage of Megan's Law and knew of its ramifications when the crime was committed.

#### iii. Rebuttable Presumption

A judge presiding over a Tier Determination Hearing "shall affirm the prosecutor's determination unless . . . persuaded by a preponderance of the evidence that it does not conform to the laws and guidelines." *Doe*, 142 N.J. at 32, 662 A.2d 367. Plaintiffs argue the judicial deference to the Prosecutor's findings establishes a "constitutionally excessive mandatory presumption against the [offender]." Moving Brief at 24. Plaintiffs cite two cases in the context of criminal proceedings which struck down presumptions against the defendant. *See Virgin Islands v. Parrilla*, 7 F.3d 1097 (3d Cir.1993) (striking down criminal statute creating rebuttable mandatory presumption); *Sandstrom v. Montana*, 442 U.S. 510, 524, 99 S.Ct. 2450, 2459, 61 L.Ed.2d 39 (1979) (presumption that has effect of shifting burden of persuasion on criminal defendant violates due process). The instant matter, however, does not involve a criminal proceeding and "thus the full panoply of rights due a defendant in such a proceeding" do not apply. *Morrissey*, 408 U.S. at 480, 488, 92 S.Ct. at 2600, 2603 (holding that a parolee can be required to prove in a parole revocation hearing why he or she should not be incarcerated). *Cf. Hendricks*, —— U.S. at ——, 117 S.Ct. at 2083 (affording criminal procedural protections to civil commitment proceeding does not transform proceeding into a criminal prosecution).

 In any event, the procedures imposed do not create a mandatory rebuttable presumption. The Prosecutor's determination is affirmed only if the State meets its burden of presenting "evidence that *prima facie* justifies the proposed level and manner of notification." *Doe*, 142 N.J. at 32, 662 A.2d 367. The Tier Determination Hearing is far from a rubber stamp. The court is free to reject the findings of the Prosecutor if he or she fails to establish a prima facie case that justifies the proposed level and manner of notification. *Doe*, 142 N.J. at 32, 662 A.2d 367. *See C.A.*, 146 N.J. at 108, 679 A.2d 1153 ("[A] court should not rely solely on [an offender's] point total when it conducts a judicial review of the [P]rosecutor's tier level classification or notification decisions. . . . [W]e do not expect the court to blindly follow the numerical calculation provided by the [RRAS], but rather to enter the appropriate [T]ier [C]lassification."); *cf. G.B.*, 147 N.J. at 80–81, 685 A.2d 1252 ("The [RRAS] is only a tool. . . . It does not graduate to an irrebutt-

able presumption.... [It] provides a guideline for the court to follow in conjunction with other relevant and reliable evidence in reaching an ultimate determination of the risk ... posed...."). Moreover, the offender is permitted to present "subjective criteria that would support a court not relying on the [T]ier [C]lassification recommended by the [RRAS]." *C.A.*, 146 N.J. at 109, 679 A.2d 1153. This includes, but is not limited to, the production of expert testimony. *See G.B.*, 147 N.J. at 79–84, 87–89, 685 A.2d 1252. The offender is permitted to bring forth any positive information to support his or her position. *See* 20 June Tr. at 40. David D., however, has not done so.

One need go no further than the instant matter to demonstrate the effectiveness of the judicial review implemented through the Act. Five of the original Plaintiffs were dropped from the suit. The claims of two additional Plaintiffs also appear to be on the verge of becoming moot. As well, the procedural history of each of the Tier Determination Hearings demonstrate the proceedings are fair, impartial and effective.

Evan E. failed to appear at the First Status Conference. Rather than entering a default judgment, as requested by the Prosecutor, the court scheduled a new court date and provided Evan E. notice. Evan E. appeared with counsel and, as a result of the First Status Conference, the Tier was changed to Tier I. The claims of Evan E. are now moot and he is no longer a Plaintiff.

Frank F. was given an initial Tier II classification. Frank F. requested an expert, which request was not opposed and was granted. At the Tier Determination Hearing the court concluded that despite the RRAS score, Frank F. was a Tier I offender. The claims of Frank F. are now moot.

Gary G. was given an initial Tier II classification. When Gary G. failed to appear at the First Status Conference the judge directed the Prosecutor to reach out to the offender to inform him of the new date. Although this was done, Gary G. appeared on the new date without an attorney. Gary G. was directed to go the public defender's office to apply for an attorney. Ultimately, although still classed as a Tier II, only the family of Gary G. and law enforcement were notified. Accordingly, Gary G. was dropped as a Plaintiff from the suit. *See* 10 April Squitieri Aff., ¶¶ 30–32.

Harry H. scored a 45, making him a Tier II risk. Prior to the Tier Classification Hearing, at the First Status Conference, the score was lowered to 41. At the Tier Determination Hearing, the judge determined the Prosecutor's Office did not meet its prima facie burden as to the degree of force used, so the tier was reduced to Tier I. 5 May Squitieri Aff., ¶ 7. The claims of Harry H. are now moot.

Irving I. scored a 43, making him a Tier II on the RRAS. The First Status Conference was adjourned by the Court due to scheduling problems until 17 April 1997. As a result of the First Status Conference, the Prosecutor's Office reduced the score from 43 to 39. An expert was requested by Irving I. which was not objected to by the Prosecutor's Office and the request was granted by the Court. On 2 May 1997, a hearing was conducted and the Court held that Irving I. was 39, however, based upon the expert report, he was held to be a Tier I risk. Thus, the claims of Irving I. are moot. *Id.*, ¶ 8.

Carl C. was personally served with the notice of the Tier Classification on 4 February 1997. At that time, Carl C. was notified that the deadline for requesting a hearing was 18 February 1997 and the preliminary conference was scheduled before Judge Ciolino on 4 March 1997. At the preliminary conference, it was agreed that in order to properly assess Carl C.'s tier a current therapist's report, verification of employment and residence were required. The matter was adjourned to [2 May 1997] due to a transition in judges.

A hearing was held before the Honorable William C. Meehan on 3 June 1997. At that time, the court ordered that Carl C. be classified as a Tier I with a review in six months to determine Carl C.'s participation and progress in counseling. *See* 10 April Eisenberg Aff.; 4 June Eisenberg Aff., ¶ 3. Carl C. has since moved to Passaic County and it appears he must undergo the Tier Classification proceedings anew. 20 June Tr. at 6. If

Carl C. remains classified as Tier I, however, his claims will be moot.

The procedural history of the Tier Determination Hearings of the other Plaintiffs also demonstrate the constitutionality and fairness of the proceedings. Alan A. requested an expert, which was granted by the court. The court heard two days of testimony and allowed Alan A. to reopen his case to have a witness testify. The judge adjourned the hearing to render the decision to 5 September 1997, on the condition Alan A. enter therapy. On 5 September 1997, the therapist will be required to testify. 22 May Squitieri Aff., ¶ 1. This procedural history suggests Alan A. will be reduced to Tier I. 20 June Tr. at 22.

Jeff J. requested an expert, which was not objected to by the Prosecutor's Office and which was granted by the court. Jeff J. requested, and received, an adjournment because his expert report was not ready. *Id.,* ¶ 4. Kenneth K. also requested an expert. The request for an expert was not objected to by the Prosecutor's Office and was granted by the court.

David D. was determined to be a Tier II risk. The transcript of the state court proceedings, which spanned five days, reflects a careful and fair deliberative process. David D. asked for an expert. As discussed, *see, supra,* note 22, the court held a hearing and determined an expert report would not "be of any meaningful value" based upon the totality of the circumstances. David D. Tier Tr. at Pa151.

The Prosecutor placed two witnesses on the stand. Plaintiff, through counsel, was given the opportunity to cross examine, but declined to do so. *Id.* at Pa163, 165–66. After the Prosecutor explained the RRAS, the court found the State established a *prima facie* case. *Id.* at Pa186.

David D. testified on his own behalf. Although denied an expert, David D. called no other witnesses to provide positive information on his behalf or to buttress the statements made in his testimony. The court

determined the RRAS score to be 63, a Tier II classification. The court based this score, among other things, upon the nature of the offense, the duration of offensive behavior, the history of anti-social acts, his education history, his criminal history, his substance abuse, his lack of therapeutic or residential support, and two psychological reports.

The court determined David D. was "an individual who poses … a moderate risk of further sexual activity with an underage victim" and affirmed the Tier Classification. The court, however, did not impose blanket notification. The court restricted the notification to six of fourteen schools within the age range of the victim, twelve years old and older. *Id.* at Pa248, 252.

The order was signed 7 April 1997. The court granted a two day stay to appeal; the Appellate Division granted a stay pending appeal. After hearing oral argument by telephone, the Appellate Court affirmed on 14 April 1997. Stay pending certification was consented to. 20 June Squitieri Aff., ¶ 3. The petition for certification was denied. *Id.*

The procedural history of all the Plaintiffs demonstrates the level playing field implemented through the Act. Where experts are requested and not opposed, the request will generally be granted by the court. *See* 10 April Squitieri Aff., ¶¶ 27, 31. If more time for investigation is needed, it will be granted by the court. *Id.,* ¶ 33. If the offender seeks to appeal the determination to a higher court, a stay pending appeal has been granted. *Id.,* ¶ 29. If the offender cannot afford counsel, counsel may be appointed. *Id.,* ¶ 32. If inclement weather precludes an expert from testifying, an adjournment of the Tier Determination Hearing has been permitted. 10 April Eisenberg Aff., ¶ 19. The accommodations made by the trial courts in these matters more than demonstrate that the judicial review is fair and adequate.

Moreover, the claims of more than half of the original Plaintiffs in this action have been rendered moot by the effectiveness of the Tier Determination Hearing process.[24] It is

---

24. This is not unusual. Attached to the Oppenheim Aff. was the latest status concerning the Tier Classifications assigned pursuant to Megan's

Law. *See* Oppenheim Aff., Exhibit. The numbers indicate many of the offenders who challenge

clear the judicial review constitutes an independent and fair assessment of the Tier Classification, one that does not violate due process.

### b. *Double Jeopardy*

 The Double Jeopardy Clause provides: "[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. Amend. 5. The Double Jeopardy Clause is violated when an individual is subjected either to a second prosecution for the same offense or to multiple punishments for the same offense. *Hendricks,* —— U.S. at ——–——, 117 S.Ct. at 2085–86; *Ursery,* —— U.S. at ——–——, 116 S.Ct. at 2139–40; *United States v. Halper,* 490 U.S. 435, 440, 109 S.Ct. 1892, 1897, 104 L.Ed.2d 487 (1989); *Artway,* 81 F.3d at 1247. Plaintiffs argue that "[b]ecause each named [P]laintiff and member of the class has already been tried, convicted and criminally punished for his [or her] conduct, the Double Jeopardy Clause bars any further proceeding or punishment for that conduct." Moving Brief at 25–7 (citing *Pataki,* 940 F.Supp. at 603; *Roe v. Office of Adult Probation,* 938 F.Supp. 1080 (D.Conn.1996); *E.B.,* 914 F.Supp. at 85; *Rowe v. Burton,* 884 F.Supp. 1372 (D.Alaska 1994); *State v. Myers,* 260 Kan. 669, 923 P.2d 1024 (1996)). Because community notification does not constitute punishment and the Tier Determination Hearing is not a criminal prosecution, Megan's Law does not violate the right to be free from double jeopardy.

### i. *Notification as Punishment*

In *Artway,* the Third Circuit established a three-part test to determine whether a statutory measure is punitive under the *ex post facto,* bill of attainder and double jeopardy clauses for the Registration Provision of Megan's Law. The *Artway* test was modified by the court in *W.P.* in light of the Supreme

Court decision in *Ursery,* —— U.S. at ——, 116 S.Ct. at 2135. *See Artway,* 81 F.3d at 1263 (predicting that *Ursery* decision would, when decided, provide further guidance); *but see United States v. Rice,* 109 F.3d 151, 155 n. 12 (3d Cir.1997) (stating that "because the *Artway* test is similar in most respects to the test adopted by the Court in *Ursery,* " the same result would be reached under either test.).

The *W.P.* court recognized that, under the modified analysis, various considerations may be employed to determine whether the Notification Provision constitutes punishment. Those considerations, however, "may not be transformed into a rigid series of hurdles which must be surmounted, one after the other, before the legislation can survive a [ ] ... double jeopardy challenge." *W.P.,* 931 F.Supp. at 1209. To determine whether the Notification Provision constituted punishment, the *W.P.* court considered 1) the Act's expressed legislative intent or purpose, and 2) its objective purpose, which included a remedial, historical and effect analysis. *Id.* at 1211–19; *Pataki,* 940 F.Supp. at 620 (employing test which analyzes intent, design, history and effects). *See also Rice,* 109 F.3d 151, 155 (3d Cir.1997) (employing *Ursery* two part test to determine whether civil sanction imposed punishment for double jeopardy purposes); *Borjesson,* 92 F.3d at 955 (employing *Ursery* ); *Doe v. Weld,* 954 F.Supp. 425, 431 (D.Mass.1996) (same); *Doe v. Criminal History Syst. Bd.,* No. 96–6046, 1997 WL 100878, at *3 (Mass.Super. 25 Feb. 1997) (same).

In *Hendricks,* —— U.S. at ——, 117 S.Ct. at 2072, the Supreme Court upheld the Sexually Violent Predator Act ("Predator Act"), enacted by the Kansas legislature. The Predator Act established "a civil commitment procedure for the long-term care and treatment of the sexually violent predator." *Id.,* at ——, 117 S.Ct. at 2077. The Court

their Tier Classification are reduced to a lower tier.

At oral argument, Plaintiffs argued the numerous reductions in the Tier Classifications is reflective of "the broad net that this Act allows the [P]rosecutors to use to begin this process." 20 June Tr. at 20. This argument is disingenuous. If the tiers were not reduced, Plaintiffs would

adopt that result as evidence the Tier Determination Hearings are not effective. On the contrary, the numerous procedural and evidentiary protections afforded the offenders demonstrate the care taken to ensure notification is disseminated to those who are likely to re-offend. The results demonstrate their effectiveness.

weighed a variety of factors to conclude the "[Predator] Act does not establish criminal proceedings and that involuntary confinement pursuant to the [Predator] Act is not punitive." *Id.*, at ——, 117 S.Ct. at 2085. The Predator Act permitted the civil commitment of inmates likely to engage in predatory acts of sexual violence who were scheduled to be released from prison.

Specifically, the Court looked to legislature's stated intent, whether the Predator Act implicated a retributive or deterrent purpose, whether the act required a finding of scienter and whether it imposed an affirmative restraint. The Court rejected the argument that the act imposed punishment because it encompassed procedural safeguards traditionally found in criminal proceedings. The Court also rejected the argument that the civil confinement imposed was punishment because it did not offer legitimate treatment. The Court concluded that the Predator Act was nonpunitive which "re-

move[d] an essential prerequisite for ... [the] double jeopardy ... claims." *Id.*

■ To determine whether Megan's Law is punishment for the purpose of the Double Jeopardy Clause, it appears the relevant inquiry first examines the Act's legislative intent, "to determine whether Congress intended the provisions to be civil and remedial or criminal and punitive." *Rice*, 109 F.3d at 154 (citing *Ursery*, —— U.S. at ——, ——, 116 S.Ct. at 2142, 2147). *See also Hendricks*, —— U.S. at —— – ——, 117 S.Ct. at 2081–82 ("We must initially ascertain whether the legislature meant the statute to establish 'civil' proceedings. If so, we ordinarily defer to the legislature's stated intent."). The court must then examine "whether the statutory scheme was so punitive in purpose, effect, or fact as to negate Congress' intention-to establish a civil remedy." [25] *Id.* (citing *Ursery*, —— U.S. at ——, ——, 116 S.Ct. at 2147, 2148); *cf. W.P.*, 931 F.Supp. at 1211–19.[26]

---

**25.** In *Ursery* and *Hendricks* the Supreme Court considered different factors to be relevant to the determination of whether the proceedings in issue imposed punishment in violation of the Double Jeopardy Clause. In (*Ursery*, the Supreme Court analyzed whether the forfeiture at issue was historically regarded as punishment for purposes of the Double Jeopardy Clause, whether there was a requirement of scienter, whether there was a deterrent effect, and the connection of the sanction to criminal activity. *Ursery*, —— U.S. at ——, 116 S.Ct at 2147). In *Hendricks*, as discussed, the Court looked to the legislative intent of the Predator Act and analyzed whether it imposed an affirmative restraint, whether it implicated retribution or deterrence, whether it required scienter.

These factors, as well as others, were addressed in the context of Plaintiffs' due process argument. It was determined that none of these factors are favorable to a finding that Megan's Law is a criminal proceeding imposing punishment. *See, supra*, Section B(1)(a) (discussing *Mendoza–Martinez* factors). The relevant factors will not be re-addressed here.

**26.** In their Reply Brief, Plaintiffs urge that the appropriate test for determining punishment is found in *Lynce v. Mathis*, —— U.S. ——, 117 S.Ct. 891, 137 L.Ed.2d 63 (1997), which emphasized that the effects caused by a statute evidences its punitive nature. Reply Brief at 5. Plaintiffs point to a recent Federal district court case which employed *Lynce* to hold that community notification was punitive. Reply Brief at 8 (citing *Doe v. Gregoire*, 960 F.Supp. 1478

(W.D.Wash.1997)). Both *Gregoire* and *Lynce*, however, addressed punishment in the context of the *ex post facto* clause.

The central concern of the *ex post facto* clause is "the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated." *Lynce*, —— U.S. at ——, 117 S.Ct. at 896 (citation and quotations omitted). "To fall within the *ex post facto* prohibition, a law must be retrospective—that is 'it must apply to events occurring before its enactment'—and it 'must disadvantage the offender affected by it.'" *Id.*, at ——, 117 S.Ct. at 896 (quotation omitted).

*Ursery* and *Hendricks*, however, addressed punishment in the context of the Double Jeopardy Clause. "[T]he difference in approach [is] based in a significant difference between the purposes of ... [the] analysis under each constitutional provision." *Ursery*, —— U.S. at ——, 116 S.Ct. at 2146. *See also Kelley*, 961 F.Supp. at 1108 ("no universal test for determining whether state action constitutes punishment applied to all of these four theories"). Neither *Ursery* nor *Hendricks* focused singularly on the effects of the proceedings to determine whether they imposed punishment.

Moreover, *Lynce* is distinguishable from the instant matter on its facts. In *Lynce*, the petitioner filed a writ of habeas corpus arguing a Florida statute was retroactively canceled in violation of the *ex post facto* clause. *Lynce*, —— U.S. at ——, 117 S.Ct. at 893. The statute in issue

### 1. Legislative Intent

■ "The starting point is the legislature's intent in passing the law in question." *Pataki,* 940 F.Supp. at 621 (quoting *Ursery,* —— U.S. at —— – ——, 116 S.Ct. at 2146–47). *See Hendricks,* —— U.S. at —— – ——, 117 S.Ct. at 2081–82 ("We must initially ascertain whether the legislature meant the statute to establish 'civil' proceedings. If so, we ordinarily defer to the legislatures stated intent."). The stated intent will be rejected only upon "the clearest proof" that the statute is so punitive in effect as to negate the intention. *Hendricks,* —— U.S. at ——, 117 S.Ct. at 2082. Nothing on the face of the Act suggests that the New Jersey legislature "sought to create anything other than a civil [notification] scheme designed to protect the public." *Id.*

■ The legislative intent of Megan's Law is set forth in the statute itself and identifies a remedial purpose. Its purpose is to address "[t]he danger of recidivism posed by sex offenders and offenders who commit other predatory acts against children, and the dangers posed by persons who prey on others as a result of mental illness" by establishing a statutory system "that will permit law enforcement officials to identify and alert the public when necessary for the public safety." N.J.S.A. 2C:7–1. Such information is "critical to preventing and promptly resolving incidents involving sexual abuse." *Id.* The legislative history of the Act further underscores the remedial nature of the Notification Provision: "The danger posed by the presence of a sex offender who has committed violent acts against children requires a system of notification to protect the public safety and welfare of the community." *Artway,* 81 F.3d at 1264 (citing Senate Bill No. 14 (introduced 12 September 1994)).

In addition to the stated purpose and legislative history, the form of the Act confirms its remedial purpose. The Act applies only to a category of persons with a statistically proven risk of committing sex offenses. Notification through the Act is not automatic. The Act created a tiered system of notification that is calibrated to the offender's relative likelihood to re-offend and the impact on the community if he or she does re-offend. *C.A.,* 146 N.J. at 101–03, 679 A.2d 1153. The RRAS is based upon factors relied upon by experts in the field of risk assessment. *Id.* at 104, 679 A.2d 1153. Community notification occurs only after an offender's relative current dangerousness has been evaluated based upon the RRAS. The Risk Assessment Manual directs that a lower risk score should be afforded those offenders who respond well to treatment, who have made a "bona fide effort to obtain treatment." *See* Risk Assessment Manual at 8–10. As well, notification may be curbed if the offense is consensual or committed against a family member. *Id.* at 6–4. Notification is narrowly tailored to ensure only those potential groups, organizations and individuals "likely to encounter" the offender are informed. *See* Notification Guidelines.

---

"authorized generous awards of early release credits" in order to address the overcrowded condition of the state prison system. *Id.,* at —— – ——, 117 S.Ct. at 893–94. Pursuant to the statute, the petitioner was released from prison. Later that year, the legislature canceled the credits for certain classes of inmates. Warrants for re-arrest were issued for certain classes of inmates, like petitioner, who were still in custody.

*Lynce* involved incarceration. The Court found the petitioner was "unquestionably disadvantaged" by the statute because "it resulted in his rearrest and prolonged his imprisonment." *Id.* at ——, 117 S.Ct. at 898. The Court noted that "it [was] quite obvious that the retrospective change was intended to prevent the early release of prisoners . . . who had accumulated [the] credits." *Id.* The Court contrasted its decision in *California Dept. of Corrections v. Morales,* 514 U.S. 499, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995), a case upholding an amendment to "California's parole procedures that decreased the frequency of parole hearings for certain offenders" for up to three years. *Id.* at ——, 117 S.Ct. at 897. In both cases, the Court considered whether the amendment had either the purpose or effect of increasing the "quantum of punishment." *Id.* In both *Lynce* and *Morales,* however, the issue of what was punishment was clear because the punishment was imprisonment. *Contra Hendricks,* —— U.S. at —— – ——, 117 S.Ct. at 2085–86 (civil confinement not punishment).

Because the "test" in *Ursery* and *Hendricks* appear to incorporate the consideration of a statute's effects, *see Ursery,* —— U.S. at ——, 116 S.Ct. at 2148, *Hendricks,* —— U.S. at —— – ——, 117 S.Ct. at 2083–86, as well as its intent, and because they directly addressed the double jeopardy issue, their instruction will be followed.

In addition, both the offender *and* the Prosecutor may appeal the decision rendered by the trial court. The parties submitted several instances in which the Prosecutor appealed or cross appealed from the Tier Determination Hearing. The issues raised on appeal varied, however some issues included the propriety of the Tier Classification and the scope of notification instituted by the trial court. That the Prosecutor can appeal the Tier Classification and notification underscores the civil nature of the proceedings.

Further, the Act provides no immunity to persons who willfully or wantonly or in bad faith provide or fail to provide information relevant to the procedures set forth in the Act. N.J.S.A. 2C:7–5, 2C:7–9. These procedural mechanisms indicate the Legislature intended to enact a remedial statute designed solely to accomplish the regulatory goal. The Legislature, and the New Jersey Supreme Court, have taken care to institute procedural and evidentiary protections that ensure notification is narrowly calibrated to the attendant risk of future re-offense. *See Hendricks,* —— U.S. at ——, 117 S.Ct. at 2083

As well, the New Jersey Supreme Court voiced its view of the remedial purpose and intent of the Legislature in enacting Megan's Law. *See, e.g., Doe,* 142 N.J. at 12–20, 662 A.2d 367. "[O]rdinarily 'we must ... accept the State [c]ourt's view of the purpose of its own law.'" *Hendricks,* —— U.S. at ——, 117 S.Ct. at 2092 (Breyer, J. dissenting) (quoting *U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779, 829, 115 S.Ct. 1842, 1867, 131 L.Ed.2d 881 (1995)). Considerable weight must be given to the finding of the New Jersey Supreme Court that Megan's Law is remedial.

### 2. *Purpose or Effect*

Plaintiffs argue that it is sufficient to demonstrate Megan's Law imposes punishment by looking at the effects of community notification. Plaintiffs argue the effects of Megan's Law are "remarkably similar to historical punishments that involved public shaming and humiliation." Moving Brief at 26. They contend the effects are "devastating and effect (sic) virtually every significant aspect of an individual's life." *Id.* They argue the Act

is punitive "because it is excessive in relation to it[s] proffered purpose." Moving Brief at 26. As discussed, Plaintiffs must demonstrate the statutory scheme of the Act is so punitive in purpose or effect that it nullifies the express intent of the legislature to deem it civil. *Hendricks,* —— U.S. at ——, 117 S.Ct. at 2082 (restraint on liberty through civil commitment held not to be so punitive as to negate legislature's civil intent). Plaintiffs have failed to do so.

Megan's Law is not excessive. The procedures imposed carefully tailor the scope of the notification. Notification is not automatic and is not imposed upon offenders who pose a low risk of re-offense. Notice is limited to people responsible for the care of children or other potential victims in the community. When notice is disseminated to the public, only those in the community likely to encounter the offender are informed. *See* Notification Guidelines at 10. Notification occurs only after the offenders' current risk of dangerousness is evaluated through the RRAS, a scale which was designed to assess the likelihood and severity of the risk of re-offense on the basis of factors recognized by experts in the field.

The Tier Determination Hearings provide further assurance that the scope of notification concerning an offender is appropriate. The offender has an opportunity to challenge his or her Tier Classification, at which time a stay of notification is imposed. The offender may appeal the decision rendered at the Tier Determination Hearing. These procedural protections demonstrate that the Notification Provision of Megan's Law is not excessive, but rationally related to the remedial, legitimate, and non-punitive goal of protecting the public. *See also W.P.,* 931 F.Supp. at 1214 ("The tailored notification for each Tier II and Tier III offender is designed to serve that remedial goal.... The means employed ... are directly proportional to the ends which Megan's Law is designed to serve.").

The alleged potential effects of Megan's Law on the offender are not sufficient to render the Notification Provision punishment. A statutory scheme serving a remedial purposes "is not punishment even though

it may bear harshly upon one affected." *Flemming v. Nestor*, 363 U.S. 603, 614, 80 S.Ct. 1367, 1374, 4 L.Ed.2d 1435 (1960) (*ex post facto* analysis). Indeed, the Supreme Court has upheld as nonpunitive a variety of regulatory schemes having very severe effects on ex-felons. *See, e.g., De Veau*, 363 U.S. at 144, 80 S.Ct. at 1146 (upholding Waterfront Commission Act which provided that no person shall collect dues on behalf of a waterfront union if any officer or agent of the union had been convicted of a felony and not been pardoned or given a certificate of good standing); *Hawker v. People of New York*, 170 U.S. 189, 18 S.Ct. 573, 42 L.Ed. 1002 (1898) (disbarment from profession); *Marcello v. Bonds*, 349 U.S. 302, 314, 75 S.Ct. 757, 764, 99 L.Ed. 1107 (1955) (deportation of a drug felon).

The most compelling example is found in *Hendricks*, in which the Supreme Court held that Kansas' Predator Act did not impose punishment and did not violate the Double Jeopardy Clause, or the *Ex Post Facto* Clause, of the United States Constitution. As discussed, the Predator Act established "a civil commitment procedure for the long term care and treatment of the sexually violent predator." *Id.*, at ——, 117 S.Ct. at 2077.

Pursuant to the Predator Act, the custodial agent of a "sexually violent predator"[27] notifies the prosecutor within sixty days of the release of an individual who may fall within the criteria of the act. The prosecutor has forty-five days to file "a petition in state court seeking the [individual's] involuntary commitment." *Id.*

A court determines whether probable cause exists to support a finding that the individual is a sexually violent predator and eligible for civil commitment. If probable cause is found, the individual is transferred "to a secure facility for professional evaluation." A trial is then held to determine "beyond a reasonable doubt" that the individual is a sexually violent predator. "If that determination [is] made, the person [is] then ... transferred to the custody of the Secre-

tary of Social and Rehabilitation Services (['] Secretary[']) ... for 'control, care and treatment until such time as the person's mental abnormality disorder has so changed that the person is safe to be at large.'" *Id.*

Even in the face of the extreme result of indefinite civil confinement, the Court held:

> Where the State has "disavowed any punitive intent"; limited confinement to a small segment of particularly dangerous individuals; provided strict procedural safeguards; directed that confined persons be segregated from the general prison population and afforded the same status as others who have been civilly committed; recommended treatment if such is possible; and permitted immediate release upon a showing that the individual is no longer dangerous or mentally impaired, we cannot say that it acted with punitive intent. We therefore hold that the Act does not establish criminal proceedings and that involuntary confinement pursuant to the Act is not punitive.

*Id.*, at ——, 117 S.Ct. at 2085.

Megan's Law and the Predator Act are not the same statute. Both acts, however, seek "to grapple with the problem" of repeat sex offenders. *Id.*, at ——, 117 S.Ct. at 2076; *see* N.J.S.A. 2C:7–1. As well, both acts require "a finding of dangerousness" as a prerequisite to imposing the challenged burden. *Id.*, at ——, 117 S.Ct. at 2080. The effect of Megan's Law, however, is notification; the effect of the Predator Act is civil confinement. Where the restriction of liberty through civil confinement is found not to constitute punishment for purposes of the Double Jeopardy Clause, it is not comprehensible how notification, a significantly less burden, can be said to do so.

The hypothetical effects that Plaintiffs allege, which do not arise out of the Notification Provision, do not compel a contrary result. The effects are based upon the Plaintiffs' arguments of how individuals who are notified in the community will react. The reactions are far from inevit-

---

**27.** "Sexually violent predator" was defined by the Predator Act as "any person who has been convicted of or charged with a sexually violent offense and who suffers from a mental abnormal-

ity or personality disorder which makes the person likely to engage in the predatory acts of sexual violence." *Id.* at ——, 117 S.Ct. at 2077.

able and fall short of the "clearest proof" required to suggest a civil proceeding is so punitive in form and effect as to render it criminal despite the Legislature's intent to the contrary. *Hendricks*, —— U.S. at ——, 117 S.Ct. at 2082; *Ursery*, —— U.S. at ——, 116 S.Ct. at 2148.

Plaintiffs cite several incidents that have occurred as a result of Megan's Law registration and notification. First Amended Complaint, ¶¶ 41, 42, 44, 47, 48, 53, 54.[28] Plaintiffs also submit numerous affidavits describing the effect of community notification. *See* Perrone Cert.; Barocas Cert.

Acts of violence or vigilantism are abhorrent, as are the crimes of the offenders; neither can be tolerated. These effects, however, should be addressed and controlled by local law enforcement, not through the elimination of necessary, appropriate legislation. As time passes, and those receiving notification become more knowledgeable about their obligations, the effects will diminish to the point of non-existence.

> [T]his Court has no right to assume that community leaders, public officials, law enforcement authorities, will not seek to educate the public concerning the Legislature's intent, including appropriate responses to notification information, responses that are not at all punitive, but seek merely to protect their children, their families and others from reoffense.

*Doe*, 142 N.J. at 18–19, 662 A.2d 367. This court can not, and does not, assume the community in general or individuals in particular, will not obey the law. In fact, this court "must presume that [the community] will obey the law." *Cf. Artway*, 81 F.3d at 1267. The existence of isolated incidents of violence, which flow from public reaction to the offender's crimes, and not from the Act itself, do not, and will not, transform Megan's Law into punishment for purposes of the Double Jeopardy Clause.

ii. *Successive Prosecutions*

Plaintiffs argue: "By subjecting [P]laintiffs to a separate proceeding which imposes

punishment based on findings of (1) the commission of a predicate offense and (2) dangerousness to the community, after they have already been tried, convicted, and sentenced for the 'predicate' offense itself, the Tier [C]lassification and notification provisions of Megan's Law run afoul of the Double Jeopardy Clause for twice placing [P]laintiffs 'in jeopardy.'" Moving Brief at 27.

■■■ "[T]he Double Jeopardy Clause prohibits a State or Federal Government from trying a defendant for a greater offense after it has convicted him of a lesser included offense." *Jeffers v. United States*, 432 U.S. 137, 150, 97 S.Ct. 2207, 2216, 53 L.Ed.2d 168 (1977). Accordingly, "where the two offenses for which the defendant is punished or tried cannot survive the 'same-elements' test, the double jeopardy bar applies." *United States v. Dixon*, 509 U.S. 688, 696, 113 S.Ct. 2849, 2856, 125 L.Ed.2d 556 (1993) (citing *Brown v. Ohio*, 432 U.S. 161, 168–69, 97 S.Ct. 2221, 2227, 53 L.Ed.2d 187 (1977); *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932)). *See also Hendricks*, —— U.S. at ——, 117 S.Ct. at 2086. Pursuant to the same-elements test, also known as the *"Blockburger"* test, the question is "whether each offense contains an element not contained in the other." *Dixon*, 509 U.S. at 696, 113 S.Ct. at 2856. "[I]f not, they are the 'same offence' and double jeopardy bars additional punishment and successive prosecution." *Id.* Plaintiffs contend they "are being subjected to a second judicial proceeding based, in part, on a crime for which they have already been tried and sentenced." Moving Brief at 28.

■■■ As discussed, the Tier Determination Hearings are civil not criminal in nature. Accordingly, the risk proscribed by the Double Jeopardy Clause, that of being tried for a criminal charge more than once, is not present. *See Hendricks*, —— U.S. at ——, 117 S.Ct. 2072 at 2086 ("Because we have determined that the [Predator Act] is civil in nature, initiation of its commitment proceed-

---

**28.** As recognized by the amicus, "the most prominent 'examples' cited arose not from notification by law enforcement, but from publicity by the news media and other private parties, often based on information obtained from the offenders' own lawsuits." USA Brief at 30.

ings does not constitute a second-prosecution."); *Breed v. Jones,* 421 U.S. 519, 528, 95 S.Ct. 1779, 1785, 44 L.Ed.2d 346 (1975) ("the risk to which the [Double Jeopardy] Clause refers is not present in proceedings that are not 'essentially criminal.' ") (citing *Helvering v. Mitchell,* 303 U.S. 391, 398–99, 58 S.Ct. 630, 633, 82 L.Ed. 917 (1938)).

Because the Notification Provision is civil in nature and does not constitute punishment within the meaning of the Double Jeopardy Clause, it follows that a hearing to assess whether such notification is warranted is not a second attempt to punish. The Tier Determination Hearing is not unlike any separate hearing afforded prior to imposition of a remedial restraint, sanction or burden based in whole or in part on facts that have resulted in or may lead to conviction. *See Allen v. Attorney General of State of Maine,* 80 F.3d 569 (1st Cir.1996) (prosecution for driving while intoxicated not barred by prior administrative suspension of license for same conduct); *United States v. Imngren,* 98 F.3d 811 (4th Cir.1996) (same); *United States v. Glymph,* 96 F.3d 722 (4th Cir.1996) (applying *Ursery* and concluding that because four year debarment served remedial purpose it did not bar a criminal prosecution); *Borjesson,* 92 F.3d 954 (9th Cir.1996) (indefinite exclusion from program served remedial purpose and did not bar imposition of a sentence).

In any event, the Tier Determination Hearings are not a successive prosecution for the same offense pursuant to the *Blockburger* test. *See* Moving Brief at 28. The underlying criminal offense is used only for evidentiary purposes to determine whether there is a risk of re-offense and a threat to the public. *Id.* The underlying criminal offense required proof of scienter by the state, an element which is not required for purposes of the Notification Provisions. Community Notification requires a demonstration that the offender pose a moderate or high risk of re-offense, which is not an element of the criminal offense. The Megan's Law proceedings and the criminal proceedings, therefore, do not address the "same offense." See *Iannelli v. United States,* 420 U.S. 770, 785 n. 17, 95 S.Ct. 1284, 1293 n. 17, 43 L.Ed.2d 616 (1975) ("If each requires proof of a fact that the other does not, the *Blockburger* test is satisfied, notwithstanding a substantial overlap" in the proof required.). Plaintiffs cannot show a probability of success on a double jeopardy claim.

### c. *Cruel and Unusual Punishment*

 The Eighth Amendment prohibits the infliction of cruel and unusual punishment. U.S. Const. Amend. XIII; *see also Trop v. Dulles,* 356 U.S. 86, 100, 78 S.Ct. 590, 597–98, 2 L.Ed.2d 630 (1958). To succeed on the claim of cruel and unusual punishment, Plaintiffs must prove that community notification imposes punishment, and that the punishment is cruel and unusual in nature. Community notification does not constitute punishment and, therefore, cannot impose cruel and unusual punishment. *Doe,* 142 N.J. at 76 & n. 10, 662 A.2d 367. Indeed, statutes with more devastating consequences have been upheld as non-punitive. *See Hendricks,* —— U.S. at ——–——, 117 S.Ct. at 2074–75 (civil confinement for sexually violent predators).

Plaintiffs argue that "branding and banishment, central to the operation of community notification, are ancient and now unusual penalties. With respect to juveniles, these measures appear even more unusual as they profoundly conflict with the public policy of protecting the privacy of minors from the stigma associated with having a criminal record." Moving Brief at 36.

Megan's Law is a remedial measure designed to protect society, not to brand or banish. The notification that occurs is calibrated to the offender's risk of re-offense through a series of procedures. Any stigma associated with having a criminal record, comes from the commission of the crime itself, not from the notification imposed through the Act.

As discussed, the Government has always had the authority to warn the community about dangerous persons. For example, the Parole Board in New Jersey has been required since 1979 to give public notice before the release of any inmate. *W.P.,* 931 F.Supp. at 1217 (citing N.J.S.A. 30:4–123.48, 30:4–123.45). As well, the Federal Bureau of In-

vestigation posts "Wanted" posters to warn the communities about individuals considered to be armed and dangerous.

The Federal Government requires states to adopt sex offender registration and notification laws in order to receive certain public funds. *See* 42 U.S.C. § 14071 (Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Program). This statute permits "information collected under a State registration program [to] be disclosed *for any purpose permitted under the laws of the State."* 42 U.S.C. § 14071(d) (emphasis added). Every state legislature has enacted sex offender registration laws, a majority of which authorize the provision of relevant information about sex offenders in order to protect the public. *See* Tables listing by state sex offender registration laws, attached to Moving Brief at Pa109 to Pa134. The provisions in Megan's Law are not unusual.

Megan's Law is not cruel. Plaintiffs contend community notification "is often disproportionate to the crime." Moving Brief at 37. Plaintiffs argue: "Despite the seriousness of most sexual crimes, many are crimes of incest, were committed by and between minors or arose out of consensual activity." *Id.* Plaintiffs contend that the consequences of community notification are likely to be lifelong and interfere with the rehabilitation of the offender. *Id.*

The Notification Provision is not automatic. Not every offender is subject to notification. The scope of the notification is defined based upon an assessment of numerous factors deemed relevant by professionals. The assessment is made with regard to the offender's particular circumstances based upon the offense committed, the offender's personal history and other relevant factors.[29] The offender has the opportunity to challenge the Tier Classification, at which time notification

is stayed. If needed, a Tier Determination Hearing will be held. The Tier Determination Hearing may result in a reduction in the Tier Classification or may cap the level of notification to only certain individuals. Indeed, such a result occurred in the case of five[30] out of eleven offenders were dropped as Plaintiffs in the instant matter. *See, supra,* note 1. As well, Carl C. was reduced to Tier I in Bergen County and Alan A. is likely to be reduced to Tier I. Any notification which does occur is accompanied by a warning that any action taken against the offender will result in arrest and prosecution. 10 April Eisenberg Aff., ¶ 7. These precautions demonstrate the Notification Provision protects against disproportionate notification and, therefore, is not cruel.

### d. *Right to Privacy*

The Fourteenth Amendment's concept of personal liberty encompasses a fundamental "right of privacy." *Whalen v. Roe,* 429 U.S. 589, 600, 97 S.Ct. 869, 877, 51 L.Ed.2d 64 (1977) (citing *Roe v. Wade,* 410 U.S. 113, 152–53, 93 S.Ct. 705, 726–27, 35 L.Ed.2d 147 (1973)). This right to privacy safeguards two different kinds of interests: " 'the individual interest in avoiding disclosure of personal matters,' and 'the interest in independence in making certain kinds of important decisions.' " *Doe,* 142 N.J. at 77, 662 A.2d 367 (citing *Whalen,* 429 U.S. at 589, 97 S.Ct. at 871). Plaintiffs argue the dissemination of information through the Notification Provision "constitutes a severe intrusion on the [P]laintiffs' constitutional right to privacy." Moving Brief at 29. If the Notification Provision is found to violate the Plaintiffs' fundamental right to privacy, the State must demonstrate a countervailing interest to justify the intrusion. *Fraternal Order of Police, Lodge 5 v. Philadelphia,* 812 F.2d 105, 110 (3d Cir.1987). The greater the harm caused

---

**29.** Indeed, the Notification Guidelines specifically address some of Plaintiffs' concerns:

> When determining the scope of notification, those members of the public to whom the offender is a risk should be considered. This must include reviewing the relationship between the offender and past victims.

Notification Guidelines at 13. The Notification Guidelines suggest that if an offender's victims

are all members of his or her immediate family, it may not be necessary to inform the schools or organizations in the community. If an offender's victims are all women, it may not be necessary to notify elementary schools or organizations that supervise children. *Id.* at 13.

**30.** These offenders are Evan E., Frank F., Gary G., Harry H. and Irving I.

by disclosure, the greater is the burden on the State to justify the intrusion. *Id.* at 110.

The threshold inquiry is whether Plaintiffs maintain a reasonable expectation of privacy in the information to be disclosed. *Doe,* 142 N.J. at 77, 662 A.2d 367. As discussed, Plaintiffs do not have a expectation of privacy in the information being disclosed. The offender's name, conviction and the circumstances and details of the conviction are a matter of public record. *Fraternal Order of Police,* 812 F.2d at 117. There is no constitutional privacy interest in matters of public record. *See Paul,* 424 U.S. at 693, 96 S.Ct. at 1157; *Scheetz v. The Morning Call, Inc.,* 946 F.2d 202, 206–07 (3d Cir.1991), *cert. denied,* 502 U.S. 1095, 112 S.Ct. 1171, 117 L.Ed.2d 417 (1992); *Trade Waste Management Ass'n, Inc. v. Hughey,* 780 F.2d 221, 234 (1985). As well, there is no privacy interest in one's physical appearance. *United States v. Dionisio,* 410 U.S. 1, 14, 93 S.Ct. 764, 771–72, 35 L.Ed.2d 67 (1973); *Doe,* 142 N.J. at 81, 662 A.2d 367.

Plaintiffs argue it is the State's conclusion that an offender is currently dangerous, which is not public record, that imposes the ultimate stigma. Amicus Reply Brief at 11–12. Plaintiffs further argue the fact that this assessment is based upon presumptively personal and private information used in the RRAS, it violates their right to privacy. *Id.* at 12–13.

The Tier Classification is determined by considering the response of an offender to psychiatric treatment and therapy, the nature of his or her family and home life, his or her employment and educational stability and his or her psychiatric and psychological profile. *See* Amicus Reply Brief at 13. That information, however, is used only to determine the future dangerousness of the offender; it is not disseminated to the community. Plaintiffs have no privacy interest in the opinion of the State as to the level of dangerousness an offender poses.

Assuming *arguendo* the Notification Provision does burden the right to privacy, *see Doe,* 142 N.J. at 77, 662 A.2d 367, the measure is necessary to fulfill a compelling state interest. In the determination of whether the state interest justifies disclosure, the following factors are considered:

the type of record requested, the information it does or might contain, the potential for harm in any subsequent nonconsensual disclosure, the injury from disclosure to the relationship in which the record was generated, the adequacy of safeguards to prevent unauthorized disclosure, the degree of need for access, and whether there is an express statutory mandate, articulated public policy or other recognizable public interest militating toward access.

*United States v. Westinghouse Elec. Corp.,* 638 F.2d 570, 578 (3d Cir.1980).

Weighing these factors, the New Jersey Supreme Court found that the "state interest in public disclosure substantially outweighs [the] [P]laintiffs' interest in privacy." *Doe,* 142 N.J. at 88, 662 A.2d 367. Plaintiffs may claim only a limited expectation of privacy in the information being disseminated. A balancing of this limited privacy interest against the State's "clear and compelling" interest in protecting the public from the danger of recidivism posed by sex offenders and the degree and scope of notification which is "carefully calibrated to the need for public disclosure," *id.* at 89, 662 A.2d 367, favors a finding that the Notification Provision does not violate the Plaintiffs' right to privacy.

Plaintiffs argue their interests in non-disclosure outweigh the State's interest in notification. The Plaintiffs' argument is fourfold and based upon 1) the significant harm that can befall the Plaintiff as a result of notification, 2) the Act's overbreadth, 3) the ineffectiveness of notification in achieving the government interest asserted and 4) the lack of safeguards to protect against unauthorized disclosures. Moving Brief at 31.

Plaintiffs contend that there is no more harsh a stigma today than being labeled as a sex offender. Plaintiffs cite *Doe v. Borough of Barrington,* 729 F.Supp. 376 (D.N.J.1990) for the proposition that the effects of disclosure may make a compelling argument for keeping certain information confidential.

In *Barrington,* a police officer violated a family's right to privacy when he revealed to their neighbor that the father was infected

with the AIDS virus. The officer had allegedly told the neighbor "to wash with disinfectant because of his concern for the prevention and avoidance of AIDS, an incurable and contagious disease." *Id.* at 385.

The court cited the hysteria surrounding AIDS and the stigma and harassment that comes with public knowledge that one is afflicted with AIDS. *Id.* at 384. It found the privacy right of the plaintiffs was breached because the Government did not show a compelling state interest to counterbalance the disclosure. The court found the objective of preventing the spread of disease was not served by the disclosure because there was no risk that the virus could be transmitted through casual contact. *Id.*

In contrast, the provisions of Megan's Law do satisfy a compelling state interest—the prevention of "potential molestation, rape, or murder by others of women and children because they simply did not know of the presence of such a person and therefore did not take the common-sense steps that might prevent such an occurrence." *Doe,* 142 N.J. at 13, 662 A.2d 367. This compelling state interest is sufficient to countervail any alleged negative repercussions that may indirectly rise from the notification.

Plaintiffs argue the "Act overreaches to encompass those who pose no genuine risk of re[-]offense and disseminates more information than is required to achieve its purpose." Moving Brief at 33. Plaintiffs argue that "[t]he affirmative empirical evidence that now exists has established that community notification does not lower recidivism rates." Moving Brief at 34 (citing "Community Notification. A Study of Offender Characteristics and Recidivism," Washington State Institute for Public Policy, October 1995) (emphasis omitted). This is, so Plaintiffs argue, because " 'offenders in the notification group were just as likely to be arrested for new sex offenses as the offenders in the comparison group.' " *Id.* Plaintiffs contend "more than a mere assertion or a mere assumption" that Megan's Law will work is needed. *See* 20 June Tr. at 31 (citing *Carey v. Population Services, Intern.,* 431 U.S. 678, 691, 97 S.Ct. 2010, 2019, 52 L.Ed.2d 675 (1977)).

The Plaintiffs misconstrue the purpose and objective of the Act. The purpose of Megan's Law is not to lower the recidivism rate of sex offenders. The purpose is to inform, as necessary, those individuals in the community most vulnerable to future attack. As outlined above, the procedures employed through the Notification Provision and the Tier Determination Hearings align the disclosure to the risk of re-offense and "restrict the damage" that community notification might do to the lives of rehabilitated offenders. *Doe,* 142 N.J. at 13, 662 A.2d 367.

As discussed, it is difficult to document the success of Megan's Law because that would require the State, in effect, to prove a negative. Affidavits submitted by the United States, however, demonstrate how community notification has been effective. *See* USA Appendix at Exhibits 21–25.

Plaintiffs additionally argue that the Act fails to protect the Plaintiffs against unintended disclosures. The Plaintiffs' hypothetical fears of unauthorized disclosure are not sufficient to hold the Act unconstitutional. In addition to the warnings against taking actions against the offender, which accompany all notifications, Megan's Law itself has provisions which will hold individuals liable for the grossly negligent or bad faith release of relevant information, N.J.S.A. 2C:7–5, or for the willful or wanton act of commission or omission with regard to the provision of information. N.J.S.A. 2C:7–9. The Megan's Law Notification Provision does not violate an offender's fundamental right to privacy.

2. *Remaining Factors for Preliminary Injunction*

For the reasons set forth above David D. has not demonstrated a reasonable probability of success on the merits. Because David D. has failed to establish this factor of the preliminary injunction analysis, it is unnecessary to address the remaining three factors—irreparable injury, harm to the nonmoving party and the public interest. *See American Tel. And Tel. Co.,* 42 F.3d at 1427 ("The injunction should issue only if the plaintiff produces evidence sufficient to convince the district court that all four factors

favor preliminary relief.") (citation omitted). Accordingly, the Request to Enjoin State Proceedings, Request to Enjoin Notification and Request for a Declaratory Judgment by David D. are denied.

### C. *Stay Pending Appeal*

 David D. is granted a stay of notification for a period of three business days to enable David D. to apply for a stay pending appeal, if any, to the Third Circuit. The factors considered in determining whether a stay is appropriate are "1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; 2) whether the applicant will be irreparably injured absent a stay; 3) whether issuance of a stay will substantially injure the other parties interested in the proceeding and 4) where the public interest lies." *Hilton v. Braunskill,* 481 U.S. 770, 776, 107 S.Ct. 2113, 2119, 95 L.Ed.2d 724 (1987); *Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders of Atlantic County,* 112 F.3d 652, 669 n. 23 (3d Cir.1997) (citing *Hilton,* 481 U.S. at 776, 107 S.Ct. at 2119). Whether to issue a stay pending appeal should be analyzed on a case-by-case basis. *Anderson v. Government of the Virgin Islands,* 947 F.Supp. 894, 897 (D.Vi.1996). As discussed, David D. has not demonstrated a probability of success on the merits justifying the imposition of a preliminary injunction or temporary restraining order.

The Defendants, however, will not be prejudiced if a stay of notification for three business days pending application to the Circuit for a stay pending appeal. Community notification for David D. has been stayed since the initiation of the Tier Classification proceedings in the state court. The Defendants agreed to a stay of notification for three days pending a resolution of the issues presented in this court. The agreed stay pertained only to the Plaintiffs named in the matter, including David D, and not to all the unnamed plaintiffs of the original proposed class. This is because, as represented by the Defendants in a similar case before Judge Politan, "[they did not know] the danger other people may present to the public" and "[they may] not be willing to hold up notifica-

tion in a particularly egregious circumstance." *See* Transcript, *Roe v. Verniero,* Dkt No. 97–148, at 32 (D.N.J. 28 February 1997). It appears the Defendants did not wish to agree to the stay of notification for an entire class of individuals because they could not predict whether an egregious circumstance would arise in which they would not agree to a stay. By agreeing to the stay for the Plaintiffs thus far, the Defendants have implicitly indicated David D. is not an "egregious circumstance." Accordingly, a three business day stay pending appeal and application to the Circuit to continue the stay, is granted for David D.

### *Conclusion*

For the reasons stated, the Request to Enjoin State Proceedings, Request to Enjoin Notification and Request for Declaratory Judgment by David D. are denied.